Donna M. MURILLO, Plaintiff,

v.

W. Lewis BAMBRICK, Clerk of the Superior Court of New Jersey, Defendant.

Civ. A. No. 79–2345.

United States District Court, D. New Jersey.

Feb. 20, 1981.

Arthur Uscher, Hackensack, N. J., for plaintiff.

John J. Degnan, Atty. Gen. of New Jersey by Mark I. Siman, Deputy Atty. Gen., Department of Law and Public Safety, Div. of Law, Banking, Insurance and Public Securities Section, Trenton, N. J., for defendant.

## OPINION

STERN, District Judge.

Plaintiff Donna Murillo, on behalf of herself and all others similarly situated, brings this action pursuant to 42 U.S.C. § 1983 challenging the constitutionality of a New Jersey law which required matrimonial litigants, and only matrimonial litigants, to pay a fifty- or sixty-dollar trial fee in addition to the filing fee required of all civil litigants. Plaintiff seeks a declaration that these laws, which were abolished by the New Jersey state legislature during the pendency of this suit, violated the equal protection clause of the Fourteenth Amendment. In addition, plaintiff requests a refund of all matrimonial trial fees collected from class members, but held in escrow by order of the Court, from the inception of the lawsuit until the demise of the challenged legislation on September 1, 1980.

### I. Facts and Procedural History

On June 18, 1979, plaintiff Donna Murillo commenced a divorce against her husband in the New Jersey Superior Court. She paid a sixty-dollar filing fee, the same fee required for all actions brought in the Superior Court, and her husband was served with a summons and complaint. When he did not appear to contest the action, plaintiff sought the entry of a default judgment. In most actions—indeed, in any state court action in New Jersey except a matrimonial action—Mrs. Murillo's case would have been ready for trial and she could have obtained a default judgment without delay. Because her action was for divorce, however, she could not obtain a default judgment until she paid an additional fee, a so-called "trial fee," of fifty dollars. This fee applied even though the matter was uncontested. Had Mrs. Murillo paid this fee, and had her husband later contested the divorce, plaintiff would have been required to pay an additional "stenographer's fee" of ten dollars before the matter could be tried. Like

the trial fee, the stenographer's fee was imposed only on matrimonial litigants.[1]

If Mrs. Murillo had been an indigent, she could have applied to have all fees waived. N.J.Court Rules 1:13–2(a), 4:79–2. At the time she instituted the proceedings, however, she earned twenty-five to twenty-eight dollars per day as a domestic, and did not qualify as an indigent. The State of New Jersey had thus placed plaintiff in a dilemma: either she would have had to pay what was to her a substantial sum to sue for divorce; or she would have remained hostage to a marriage which under the substantive law of the State she was entitled to have dissolved.

Mrs. Murillo filed suit in August 1979 in federal court seeking a declaration that the state statutes under which additional trial fees were collected only from matrimonial litigants, N.J.Stat.Ann. § 2A:34–16 and N.J. Court Rule 4:79–2, violated the equal protection clause of the Fourteenth Amendment. On September 26, 1979, at an initial hearing on plaintiff's application for a temporary restraining order, we found that Mrs. Murillo had demonstrated immediate and irreparable harm[2] and the likelihood of success on the merits. The Court, pursuant to Rule 23, Fed.R.Civ.P., provisionally certified a class consisting of all matrimonial litigants in the State of New Jersey who had not yet paid their trial or stenographic fees and entered a temporary restraining order. The order required defendant W. Lewis Bambrick, Clerk of the Superior Court of New Jersey, to deposit all fees collected pursuant to N.J.Stat.Ann. § 2A:34–16 and N.J.Court Rule 4:79–2 in an interest-bearing bank account rather than transfer the funds to the general state treasury, as was the usual procedure.

During hearings conducted in late September and early October 1979, it came to the Court's attention that the provisions under attack by Mrs. Murillo were also the subject of review by the New Jersey Supreme Court and the state legislature. At the suggestion of the State, and with plaintiff's consent, the Court stayed this action to permit the State to resolve this matter, if possible, by legislative action. The stay would afford the New Jersey Supreme Court a reasonable time to evaluate the fee structure of the court system, to make whatever recommendations it deemed appropriate to the Governor and legislature, and would permit the legislature a reasonable time to act on the Supreme Court's recommendations. The parties agreed to continue the restraints in the interim: all matrimonial fees would be collected from litigants seeking divorces and deposited in the interest-bearing escrow account created by order of the Court. None of these actions would prejudice the rights of the parties to the fund.

In the summer of 1980 the anticipated reforms finally came to pass. The state legislature abolished the special trial and stenographer's fees exacted from matrimonial litigants and created a uniform system for all categories of civil litigation.[3] The

---

1. These fees were set forth in both a statute and a court rule. N.J.Stat.Ann. § 2A:34–16 provided:

    Except in actions in forma pauperis, before any matrimonial action is approved for trial the plaintiff or counterclaimant shall pay to the clerk of the superior court, for the use of the state, the sum of $50 and in litigated actions the additional sum of $10.

    New Jersey Court Rule 4:79–2 provided:

    Except as otherwise provided by R. 1:13–2 [actions by indigents], before any matrimonial action is approved for trial the plaintiff or counterclaimant shall deposit with the clerk the sum of $50 and in litigated actions the additional sum of $10 for stenographic fee. The aforesaid fees together with the request for approval for trial of the matrimo-

nial action shall be forwarded to the clerk within 30 days of the entry of default or the service of a pleading contesting the action.

2. Had Mrs. Murillo paid the fee to the State and later prevailed in her constitutional challenge to the statute, the Eleventh Amendment would bar recovery of the money which she would have expended. *See Edelman v. Jordan*, 415 U.S. 651, 663–65, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974).

3. In the same act that abolished the special matrimonial trial fees, the legislature raised the standard filing fee required of all litigants in the Superior Court from sixty dollars to seventy-five dollars. *See* N.J.Stat.Ann. §§ 22A:2–6, 22A:2–12 and 22A:2–15.

legislation was made effective September 1, 1980, but matrimonial litigants were afforded only prospective relief. Thus, the rights of Mrs. Murillo and her fellow class members were still at issue. From September 27, 1979, through September 1, 1980, all of the fees generated under the former system had been collecting in the escrow account, a sum now estimated at $1.3 million. Although the state legislature had abolished the dual fee system for all future litigants, defendant Bambrick maintained that the State was entitled to keep the funds it had already collected and held in escrow. Despite the Court's efforts to accommodate the State's request for an opportunity to resolve this matter on its own, we were required to conduct a trial and reach a determination on the merits of plaintiff's constitutional claim. The trial took place on September 9 and 10, 1980. At its conclusion, we found that the New Jersey scheme under which matrimonial litigants were required to pay special trial and stenographic fees was not a rational means to further any articulated state interest, and held that the scheme violated the equal protection clause of the Fourteenth Amendment. Accordingly, we ruled that plaintiffs were entitled to a refund of the monies paid into the escrow account with interest. This opinion is intended to explain and supplement that decision.

## II. Standard of Review

■ The Supreme Court has established two standards for evaluating whether legislation satisfies the equal protection clause. If the challenged classification operates to the disadvantage of a suspect class or impinges upon a fundamental right under the Constitution, the statute will be invalidated unless the state can demonstrate a compelling interest in making the classification. This is a very heavy burden, and the determination that a statute creates a suspect classification or impinges on a fundamental interest has usually been fatal. Thus far, the Supreme Court has limited suspect classifications to race, national origin, and alienage, and fundamental interests have been limited to the right to vote, the right to interstate travel, the right to appeal in criminal cases, and the right of access to the courts in certain civil cases.[4]

■ If, as in this case, no suspect class or fundamental interest is present, the statute must still pass the "rational basis" test—that is, the classification must rationally further "some legitimate, articulated state purpose." *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973).[5] The rational basis test has traditionally been highly deferential. As the Court stated in *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970):

In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369. "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Metropolis Theatre Co. v. City of Chicago*, 228 U.S. 61, 69–70, 33

4. Plaintiffs do not contend that their "right of access" to the state courts to obtain a divorce has been violated by the statutes in question. *See Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 173 (1971). The constitutional right of access is satisfied by provisions requiring waiver of the fee for indigents. N.J. Court Rules 1:13–2(a); 4:79–2.

5. In addition, the Supreme Court has in some cases appeared to treat sex in a category in between suspect classifications and other classifications requiring application of the rational basis test. *See Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). It is clear that "matrimonial litigants" are not a suspect class and that the intermediate standard which has apparently been applied in sex discrimination cases should not be extended to other classifications.

S.Ct. 441, 443, 57 L.Ed. 730. "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393.

On the other hand, the Court has made clear that it will no longer uphold a statute on any basis that the state happens to put forth. The state must establish that its legislation is intended to further a "legitimate, articulated state purpose." *Weinberger v. Wiesenfeld,* 420 U.S. 636, 648, 95 S.Ct. 1225, 1233, 43 L.Ed.2d 514 (1975). The mere recitation by the state of a benign purpose in discriminatory legislation "is not an automatic shield which protects against inquiry into the actual purposes underlying a statutory scheme." *Id.* The Court in that case observed that "[the] Court need not in equal protection cases accept at face value assertions of legislative purposes when an examination of the legislative scheme and its history demonstrate that the asserted purpose could not have been a goal of the legislation." *Id.* at 648 n.16, 95 S.Ct. at 1233 n.16. *See also Minnesota v. Clover Leaf Creamery Co.,* —— U.S. ——, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981).

### III.  The Fifty-dollar "Trial Fee"

#### A.  Background

To determine whether the challenged provisions rationally serve a legitimate, articulated state interest it is important to understand the evolution of the substantive and procedural law of divorce in New Jersey.

Until recently, New Jersey recognized only three grounds for divorce: adultery, desertion, and extreme cruelty. N.J.Rev. Stat. § 2A:34–2 (1952). The State considered divorce a remedy reserved only for the most unusual circumstances, not merely for every situation in which both parties agreed they wanted to dissolve their marriage.

In accordance with the State's determination to scrutinize all divorce cases carefully, a system developed as early as the turn of the century whereby special masters were appointed to review each divorce case before it went to trial. These special or advisory masters screened every file and reported to the chancellors, who ultimately heard only nonconsensual, nonfraudulent matrimonial cases. Originally, the advisory masters were compensated pursuant to rules promulgated by the Chancery Court. For example, under Rule 266, Revised Chancery Rules (1928), matrimonial litigants seeking a hearing before an advisory master and a subsequent trial were required to deposit fifty dollars with the clerk of the court. Since the State had an interest in preventing divorces on grounds other than those explicitly permitted, it considered itself a party, albeit not in name, to every suit for divorce. The State was omnipresent, standing over the shoulders of the litigants—in the body of the advisory master—to prevent collusive divorces.

Although the State eventually phased out the office of advisory master, it still intended the judicial system to exercise particularly careful oversight of divorce suits. In 1948, the legislature created the system of matrimonial trial fees at issue in this case. No legislative history of the act exists, but testimony introduced at trial indicates that the legislature intended that, as the system of advisory masters was abolished, the existing judicial structure would be required to perform tasks previously executed by the masters. The fee system created by the newly-enacted statute would institutionalize financial support for a category of cases requiring closer judicial scrutiny and a greater allocation of court resources. Although the exact purpose of the legislature in 1948 is now enshrouded in the mists of time, the fees fixed by the statute were the same as those formerly awarded to the masters by court rule. Thus, the 1948 statute represented a change only in procedure, not in substantive state policy.

In 1971, New Jersey's substantive law of divorce underwent a dramatic change. The state legislature, for the first time, adopted a provision which permitted divorces on consent of the parties. The Divorce Act

was amended, effective September 13, 1971, to permit as grounds for divorce:

Separation, provided that the husband and wife have lived separate and apart in different habitations for a period of at least 18 or more consecutive months and there is no reasonable prospect of reconciliation. Provided, further, that after the 18-month period there shall be a presumption that there is no reasonable prospect for reconciliation.

N.J.Stat.Ann. § 2A:34–2(d). Whereas the State had previously sought scrupulously to prevent the consummation of collusive divorces, it now provided that a divorce would be granted solely on a showing that a husband and wife had lived separate and apart, either voluntarily or involuntarily, for 18 months.

The purpose of this "no-fault" divorce provision was evinced by the New Jersey Divorce Study Commission which recommended the passage of the legislation:

In such cases the parties should not be required to resort to the hypocrisy of accusing one or the other of a marital wrong recognized by our present statutes, or the remedy of migratory divorce, which may in any event be beyond their financial resources. Similarly, the Commission is equally convinced that where both parties are guilty of offenses against one another, mutuality of fault should not be a bar to divorce. This can be viewed only as the infliction of punishment by the State. It cannot be justified.

*Final Report to the Governor and the Legislature of the Divorce Law Study Commission*, 6 (May 11, 1970). More succinctly, the Superior Court announced shortly thereafter that the rationale of the recent amendments to the Divorce Act (L.1971, 212) was "to terminate dead marriages regardless of fault or lack of fault." *Quinn v. Quinn*, 118 N.J.Super. 413, 414, 288 A.2d 51, 52 (Ch.Div.

1972). *See also Painter v. Painter*, 65 N.J. 196, 205, 320 A.2d 484, 489 (1974); *Babushik v. Babushik*, 157 N.J.Super. 128, 130, 384 A.2d 574, 575 (Ch.Div.1978) ("The public policy of New Jersey is to terminate dead marriages"). While the no-fault provision did not represent an abdication of any interest the State had in overseeing the divorce process, *see Manion v. Manion*, 143 N.J.Super. 499, 502, 363 A.2d 921, 923 (Ch. Div.1976), it clearly represented a much more liberal conception of divorce than had theretofore existed.

### B. State Interests Involved

Defendant, represented by the Attorney General of the State of New Jersey, has contended that the vestigial statutes imposing higher fees on matrimonial litigants remained, *at the time this suit was filed*, a rational means to further two objectives. First, and it seemed at the time foremost, defendant argued that the additional fees helped pay for the additional court resources required for matrimonial cases.[6] Second, defendant contended that the statutes served the State's legitimate interest in "not encouraging" divorces.[7] While it cannot be disputed that a state may have a legitimate interest in regulating domestic relations, *Sosna v. Iowa*, 419 U.S. 393, 404, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975), and in financing its court system, *Manes v. Goldin*, 400 F.Supp. 23, 30–31 (E.D.N.Y.1975), aff'd, 423 U.S. 1068, 96 S.Ct. 851, 47 L.Ed.2d 80 (1976), plaintiff contends that by the time this suit was commenced, the extra charges placed on matrimonial litigants could no longer be justified on either of these bases.

### 1. Added Costs

■ We turn first to the argument defendant relied on principally throughout the proceedings until the second day of trial. Defendant contended that the matrimonial

---

6. On the second day of trial, as will be explained more fully later, defendant abandoned this argument. *See* pages 836–837 *infra*.

7. Defendant contended throughout the proceedings in this case that a meaningful distinc-

tion could be made between "not encouraging" and "discouraging" divorces and relied solely on the former as a rational basis. As explained, *see* notes, 8–11 *infra*, the Court rejects this distinction.

fees provided a means of supporting the additional court costs required to give divorce cases the high degree of scrutiny required under New Jersey law. In support of its contention, defendant pointed to the following characteristics of matrimonial litigation: (1) matrimonial judges review each file to see that service of process has been properly made before trial approval is granted; (2) seven judges in New Jersey have been assigned exclusively to matrimonial matters and eleven others are temporarily assigned to matrimonial matters in addition to other duties; (3) judges from the Superior Court, Law Division, must sometimes be assigned to hear uncontested matrimonial matters on a part-time basis; (4) the clerk's office examines each file in matrimonial cases to determine if there has been a responsive pleading filed and to determine whether a default has been properly entered; (5) the clerk's office employs four persons full-time to send out approval notices; (6) the court rules require a hearing with the plaintiff present in every matrimonial action, even in those cases which are uncontested; and (7) in child custody matters, the judge often requests a report from the county probation department or the state Bureau of Child Welfare on the family living conditions. In addition, defendant argued that the State is a third party, albeit unnamed, in every matrimonial litigation. This, too, ostensibly results in added expenses, although most likely, if at all, to the executive branch rather than the court system. These features of the matrimonial litigation system, defendant contended, required the imposition of fees which amounted between September 1979 and September 1980 to approximately $1.3 million.

The Court finds that the matrimonial litigation system in New Jersey is not a particularly autonomous process and does not require additional monies to operate in conformity with state law. The process by which a case is reviewed to ensure that a complaint and answer have been properly filed and that service was proper is purely ministerial, and could not occupy a significant portion of the time of even the clerk's office relative to other types of cases. The fact that certain judges are assigned exclusively or in part to matrimonial matters in no way indicates that more total judicial time is spent on these matters.

It is clear that the additional fee was intended not to finance the additional clerical time spent on matrimonial cases, but the extra time which a judge was *formerly* required to spend on such cases. The trial fee had its genesis in the fifty-dollar fee paid to the omnipresent advisory masters. In 1948, when judges assumed the duties formerly carried out by the masters, the fee was retained to cover the new burden on the judicial system. If it were true that prior to New Jersey's institution of no-fault divorce, matrimonial cases took up more of a judge's time than other types of cases, it is readily apparent that this is no longer the case. The no-fault divorce statute provides that there shall be a presumption of irreconcilable differences if the parties to a marriage are separated for at least eighteen months; in practice the mere passage of time is sufficient to obtain a divorce. The majority of all divorce cases are now uncontested,[8] and plaintiffs in such cases are rarely before the judge for more than a few moments.[9] Although a minority of actions, filed on the basis of fault, may still require special judicial scrutiny, most matrimonial litigants require no extraordinary judicial supervision. Indeed, it was demonstrated at trial that *the average cost of disposing of a matrimonial case was significantly less than the average cost of adjudicating other civil actions.*[10] As defendant admitted on the second day of trial, the State's belief that it was collecting these fees to defray the higher cost of providing judicial services to matrimonial litigants was false. In fact,

---

**8.** Approximately 60% of all divorce matters are uncontested. Plaintiff's Trial Exh. P–1.

**9.** Transcript of 9/9/80, at 31–33.

**10.** The estimated ratio of revenue to expense for matrimonial cases is 52.9% compared with 29.8% for general civil law and general equity cases. See Defendant's Trial Exh. D–1.

following plaintiff's submission of proof, defendant withdrew its first suggested rational basis.[11]

### 2. Not Encouraging Divorces

■ As a legal matter, then, the State was left with one legal leg on which to stand. It still claimed that it could collect higher fees from matrimonial litigants as a rational means of furthering a state policy of "not encouraging" that particular kind of litigation.[12] Defendant contends that the State has had a longstanding policy of "not encouraging" divorces, and that this policy continued at least through September 1980.

Solely because the defendant in this case is an officer of the State of New Jersey, represented by the Attorney General of New Jersey, does not mean that the Court is bound to accept his every contention as to the articulated purposes of the State. Although defendant may be cloaked in the mantle of the State of New Jersey when he appears before this Court, he does so with the same burdens and responsibilities as any other litigant. Defendant's avowals of New Jersey state policy are not sacrosanct. This Court is empowered—indeed, it is required—to pierce the surface of defendant's assertions and to examine the actual purposes underlying the statute in question. *Weinberger v. Wiesenfeld, supra,* 420 U.S. at 648, 95 S.Ct. at 1233.

An examination of the legislative scheme, including the history of its enactment and demise, indicates clearly that at least since passage of the no-fault divorce law, the purpose of the matrimonial fee system has not been to discourage divorces. As has been pointed out earlier, testimony adduced at trial showed that the primary purpose of N.J.Stat.Ann. § 2A:34–16 was to subsidize the general state court system financially

11. We observe, however, that even had defendant successfully demonstrated that matrimonial cases required a greater expenditure of court resources than other typical civil cases, defendant failed adequately to explain why matrimonial litigants alone had been singled out from among the many groups of litigants in other cases routinely requiring extra judicial supervision. Class actions, actions involving minors and incompetents, probate and adoption matters, to mention but a few, all require independent judicial scrutiny. In none of them, whether contested or not, are the litigants required to post the additional fees required of matrimonial litigants.

12. We place the words "not encouraging" in quotation marks because a significant amount of time was spent at oral argument divining the elusive distinction between the words "discouraging" and "not encouraging" in the context of this lawsuit. Counsel for defendant refused to admit that the state policy underlying the matrimonial fee system was to discourage divorce actions, preferring to portray state policy as one of "not encouraging" such cases. For example, the following colloquy took place between the Court and counsel:

THE COURT: Do you take the position that you can charge more simply to discourage that kind of litigation?

MR. SIMAN: We take the position that the State can make a value judgment, that they don't want to encourage divorce....

THE COURT: Do you take the position that you can charge more to discourage that kind of litigation?

MR. SIMAN: I'll use the words of the cases. We can in fact charge more; by doing that, not encourage divorces.
Transcript of 9/10/80 at 69.

Whatever the linguistic or metaphysical distinctions between discouraging an act and not encouraging an act, this Court is convinced that any distinction between the two concepts in the context of this lawsuit, is illusory. The effect on matrimonial litigants, like Mrs. Murillo, is the same, as witness this earlier exchange in oral argument:

THE COURT: Tell me what is the rational relationship that requires if A sues B it costs $60 unless A is Mr. or Mrs. B.

MR. SIMAN: The rational relationship is the State's interest in the matrimonial relationship.

THE COURT: You mean they want to discourage such lawsuits?

MR. SIMAN: I don't know if that's the policy ground for discouraging these things. I think they want to—this is a solemn relationship that has been entered into.

THE COURT: It becomes more solemn when it is more money?

MR. SIMAN: No. I wouldn't—I wouldn't say that. But I think they want to—well perhaps, they want to make litigants think twice or think carefully before they proceed like this....

Perhaps, I think, wouldn't seek it lightly is a better characterization.
Transcript of 9/17/79 at 5-6.

for assuming the duties of heightened scrutiny once performed by the advisory masters in divorce cases. Implicit in the requirement that matrimonial cases be specially reviewed may have been the notion that the State sought to discourage collusive or consensual divorces; if so, the legislature abandoned this policy when it passed the no-fault divorce law in 1971. No longer did it cost more to process matrimonial cases; no longer could the State say that it sought not to encourage divorces. Indeed, the State had said just the opposite. Once the State determined that its citizens could have a divorce, *as a matter of right*, after an 18-month separation, it could not continue to make it more expensive for its citizens to assert those rights, based on a policy which it discredited and set aside. It would be a most unfair inconsistency to litigants such as Mrs. Murillo on the one hand to encourage the termination of dead marriages and on the other to raise substantial financial barriers to obtaining a divorce. *See, e. g., Quinn v. Quinn*, supra, 118 N.J. Super. at 414, 288 A.2d at 52.

Consideration of the recent legislative action deleting N.J.Stat.Ann. § 2A:34–16 sheds further light on this question. In a statement appended to Assembly Bill No. 1073, which abolished the matrimonial fee system, the Assembly Judiciary Law, Public Safety and Defense Committee stated:

> In the past, the $50.00 or $60.00 differential required for matrimonial cases was justified by an additional review provided in such cases by a standing master who determined whether or not the matter was fit for trial. Today, no similar review exists to justify any such differential in fees.

This statement, made by a committee of the state legislature in a non-adversarial posture, is persuasive corroboration of the testimony at trial that the fee system was not designed to discourage divorces but was merely a carryover from the days of the standing masters. The Assembly Committee concluded that "[t]he elimination of these fees would thus serve to eliminate an anachronism from the court's fee structure." These remarks were echoed by the Senate Judiciary Committee, which pointed specifically to 1971 and the divorce law revision as the juncture at which N.J.Stat. Ann. § 2A:34–16 became an anachronism. Sen.Jud.Comm. Statement to Assembly, No. 1073 (June 26, 1980). These statements strongly suggest that the trial fee was probably never intended to discourage divorces; rather, it was a means of generating support for a more expensive category of litigation. However, such a finding is unnecessary to our decision. It is sufficient that we find that, after 1971, the purpose to discourage divorces has not existed, despite defendant's contentions to the contrary, and the State has no other legitimate interest in discriminating against matrimonial litigants.[13]

### IV. The Ten-dollar "Stenographer's Fee"

Finally, the additional ten dollar "stenographer's fee" required of matrimonial litigants whose cases are contested is imposed without any articulated reason.[14] Any litigated case is more expensive for the State than cases which are uncontested, but matrimonial litigants alone were forced to pay this special stenographer's fee. In oral argument defendant contended that the State's interest in the marital relationship was the only justification for the fee:

> THE COURT: Can you explain a rational basis, any rational basis, for treating those two sets of litigants differently in respect to the $10 court reporter fee?
>
> MR. SIMAN: Assuming the money goes to the upkeep of the court reporter?

---

13. We need not decide whether, assuming New Jersey sought to discourage divorces, the imposition of a higher filing or trial fee would be a permissible means of achieving that objective. We note, however, that any attempt to discourage lawsuits which seek to protect rights granted by the substantive law of the State inherently discriminates against litigants, like Mrs. Murillo, who are not wealthy.

14. It is doubtful that this fee would have been constitutional even before the promulgation of no-fault divorce.

THE COURT: It does not. It goes to the general state treasury. The court reporter gets the same salary whether he sits in matrimonial disputes or in an intersection accident dispute.

MR. SIMAN: I would just rest on the fact that the state has an additional interest in the matrimonial area that it doesn't have—

THE COURT: Why does it mean that the litigants have to pay money in respect to a court reporter fee? You have explained to me that took care of the filing fee. You have explained to me the filing fee is higher because all matrimonial cases are in effect litigated because the judge has to do something extraordinary. He can't take the settlement. But having already exacted that fee once, for that reason, why is it that if they actually go into litigation, that they have to pay $10 for the services of a court reporter who is furnished for free in every other kind of case? What is the rational basis for distinguishing between those people who litigate depending on whether they litigate in matrimonial actions versus any other kind of actions . . . . ?

MR. SIMAN: I'm frankly, other than the fact that it's the state's interest, the way you phrased the question, I'm at a loss to submit something at the present time.

Transcript of 9/26/79, at 82–84.

Nothing has been presented to this Court subsequently to justify the imposition of the "stenographer's fee." This fee, clearly a vestige from the days when every divorce case required special scrutiny, serves no present state purpose.

Accordingly, the Court holds that the entire matrimonial fee system contained in N.J.Stat.Ann. § 2A:34–16 and N.J.Court Rule 4:79–2, now abolished by legislative enactment, was an unconstitutionally discriminatory scheme which violated plaintiff's rights under the equal protection clause of the Fourteenth Amendment. All monies contained in the interest-bearing bank account created pursuant to Court order and representing all of the matrimonial fees illegally collected between September 27, 1979, and August 31, 1980, will be returned with interest to the individuals who deposited them. Counsel will please submit an order in ten days.