Donna M. MURILLO

v.

W. Lewis BAMBRICK, Clerk of the Superior Court of New Jersey, Appellant.

No. 81–1786.

United States Court of Appeals, Third Circuit.

Argued Oct. 29, 1981.

Decided June 17, 1982.

899

James R. Zazzali, Atty. Gen. of N. J., Bertram P. Goltz, Jr., Deputy Atty. Gen. (argued), Erminie L. Conley, Asst. Atty. Gen., Trenton, N. J., for appellant.

Arthur Uscher (argued), Joseph Russo, Hackensack, N. J., for appellee.

Before ADAMS, ROSENN and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

In this appeal, we are asked to review an order of the district court holding unconstitutional a New Jersey statute and court rule, both now repealed, that assessed higher filing fees in matrimonial actions than in other civil cases. Unlike the district court, we conclude that the Constitution of the United States was not violated by the State's imposition of a "trial fee" upon individuals seeking divorces, but not upon other civil litigants. Whatever the wisdom of New Jersey's legislation, in our view the classification at issue here neither contravened a fundamental interest, so as to trigger heightened scrutiny, nor constituted an act devoid of rationality, so as to fall short of the minimal requirements for orderly government. Accordingly, we reverse.

I

On June 18, 1979, plaintiff Donna Murillo, a resident of New Jersey, filed for a divorce in New Jersey Superior Court and paid the sixty-dollar filing fee required of all complainants in that court. Because hers was a matrimonial action, N.J.S.A. 2A:34–16 and N.J. Court Rule 4:79–2 applied.[1] According to these provisions, divorce actions commenced by litigants such as Murillo, even if uncontested, were not listed for trial until an additional fifty-dollar fee, applicable only to matrimonial actions, had been paid. If such an action were contested, an additional ten-dollar payment, designed to cover the cost of stenographic services, was necessary. Murillo, on behalf of herself and all others similarly situated, filed this suit in the district court, seeking a declaration that the special matrimonial litigation fee imposed by New Jersey violated the equal protection clause of the fourteenth amendment.

After certifying the case as a class action, the district court, at the suggestion of the State, stayed further proceedings in order to provide the New Jersey Legislature with an opportunity to review the matrimonial fee arrangement. So that the resulting delay would not prejudice the plaintiffs, however, the court ordered defendant W. Lewis Bambrick, Clerk of the Superior Court of New Jersey, to deposit all such fees collected after September 6, 1979, in a separate interest-bearing account. On August 1, 1980, the Legislature repealed N.J.S.A. 2A:34–16, effective September 1, 1980,[2] and shortly thereafter, the State's Supreme Court deleted N.J. Court Rule 4:79–2. The Legislature's repeal of the matrimonial fee was prospective only, however: no provision was made for the return of the fees held in escrow pursuant to the district court's order. It is this fund, consisting of fees collected after the institution of this action and currently amounting to approximately $1.5 million, that is the subject of the present dispute.

Following the Legislature's action, the district court reopened the case and, after a two-day trial, concluded that the divorce trial-fee arrangement violated the equal protection clause. *Murillo v. Bambrick*, 508 F.Supp. 830 (D.N.J.1981). After determining that the applicable standard for evaluating the legislation was the rational basis test, the district judge held that the statute

---

1. N.J.S.A. 2A:34–16 (West) (repealed 1980) provided that

   [e]xcept in actions in forma pauperis, before any matrimonial action is approved for trial the plaintiff or counterclaimant shall pay to the clerk of the superior court, for the use of the state, the sum of $50 and in litigated actions the additional sum of $10. N.J. Court Rule 4:79–2 (deleted 1980) elaborated upon this statutory requirement:
   Except as otherwise provided by R[ule] 1:13–2 [relating to actions brought by indigents], before any matrimonial action is approved for trial the plaintiff or counterclaimant shall deposit with the clerk the sum of

   $50 and in litigated actions the additional sum of $10 for stenographic fee. The aforesaid fees together with the request for approval for trial of the matrimonial action shall be forwarded to the clerk within 30 days of the entry of default or the service of a pleading contesting the action.

2. 1980 N.J.Sess.Law Serv., ch. 80, § 4. The Legislature simultaneously raised the general filing fee for all civil actions from $60 to $75, in order "to adjust for the elimination of the matrimonial fees and to compensate for inflationary pressures." *Id.* at 271.

was "not a rational means to further any articulated state interest." *Id.* at 833. Specifically, the court found that the first justification urged by the State, that "the additional fees helped pay for the additional court resources required for matrimonial cases," was empirically incorrect. *Id.* at 835–36. As to the State's second proffered justification, that the divorce fees "served the State's legitimate interest in 'not encouraging' divorces," the court found that, at least since New Jersey's adoption of a "no-fault" divorce system in 1971, "the purpose to discourage divorces has not existed." *Id.* at 835, 838. The district court therefore ordered that the fees held in escrow by defendant Bambrick be refunded with interest to the appropriate individuals, but stayed that directive pending the State's appeal.

## II

■ Although the underlying dispute in this appeal may appear to involve a narrow and relatively unimportant statute, since repealed, we believe that the district court's decision raises important questions about the nature of judicial review under the equal protection clause. It is appropriate, therefore, to commence our analysis with a consideration of general principles.

In large part, legislative acts classify; by their very nature, they draw distinctions between groups of individuals and among various forms of human endeavor.[3] A legislative act, therefore, cannot be deemed invalid merely because it treats different persons or different activities differently. Instead, some general standard as to the permissibility of legislative distinctions must be identified and applied, lest a con-

siderable portion of our laws be disapproved in a relentlessly logical, but ultimately self-defeating, pursuit of abstract equality.

The fourteenth amendment, in providing that no state shall "deny to any person within its jurisdiction the equal protection of the laws," has been construed to set out such a standard. This "equal protection clause" has never been interpreted so as to strike down all legislative efforts that do not apply "to all persons at all times and in all places," *Trimble v. Gordon*, 430 U.S. 762, 785, 97 S.Ct. 1459, 1472, 52 L.Ed.2d 31 (1977) (Rehnquist, J., dissenting). Rather, "recognition of the inevitability and indeed the justice of some line-drawing [has made] the central task of equal protection theory one of determining which lines or distinctions are permissible." Fiss, *Groups and the Equal Protection Clause,* 5 Phil. & Pub. Aff. 107, 109 (1976). Toward this end, in the course of several decades of constitutional litigation, the equal protection standard has come to be thought of as primarily two-tiered: enactments that discriminate against suspect classes or trench upon fundamental rights are disfavored, and will be tolerated only if necessary to achieve a compelling governmental interest, while statutes in the economic, social welfare, or regulatory fields are subjected to far lesser scrutiny, and will be upheld unless not rationally related to legitimate public ends.[4] With respect to a statute challenged on equal protection grounds, therefore, a reviewing court is obligated initially to determine the appropriate level of judicial review, and then carefully to consider whether a sufficient showing has been made under that test so as to override the presumption of constitutionality ordinarily accorded

**3.** *See* Tussman & tenBroek, *The Equal Protection of the Laws,* 37 Cal.L.Rev. 341, 343–44 (1949); *see also Martin v. Struthers,* 319 U.S. 141, 154 (1943) (Frankfurter, J., dissenting) ("[t]he right to legislate implies the right to classify"); Choper, *Economic and Social Regulations and Equal Protection,* in The Supreme Court: Trends and Developments 1980–1981 at 1 (D. Opperman ed. 1982).

**4.** On occasion, the Supreme Court has employed an "intermediate" standard of equal protection review. Under this "middle-tiered"

approach, laws that classify on the basis of certain specified, but non-suspect, characteristics—such as sex, alienage, and illegitimacy—will be accepted if substantially related to important state objectives. *See, e.g., Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976); *see generally* Blattner, *The Supreme Court's "Intermediate" Equal Protection Decisions: Five Imperfect Models of Constitutional Equality,* 8 Hastings Const.L.Q. 777, 780–800 (1981).

to legislative pronouncements. The purpose of such an analysis is not to replace legislative judgments with judicial views of effective or salutary public policy; rather, it is to ensure that a legislative majority adheres to its constitutional obligation to govern its citizens fairly.

## A

■ Given this backdrop, we first consider the matter of the appropriate standard of equal protection review applicable to the controversy before us today. The district court concluded that, "in this case, no suspect class or fundamental interest is present," and that therefore the rational basis test was applicable. 508 F.Supp. at 833.[5] Inasmuch as the Supreme Court thus far has declined to deem classifications based on factors other than race and national origin—and, arguably, sex, alienage, and illegitimacy, see note 4 supra—as inherently "suspect," we agree with the holding of the district court that the interests of no suspect class are involved here. Whether or not New Jersey's legislation trespasses upon a "fundamental right" is a more difficult question, however, and requires a more extended discussion.

The fundamental rights component of the equal protection clause can be traced to Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), in which the Supreme Court invalidated a statute providing for compulsory sterilization of "habitual" criminals, on the ground that such a rule impermissibly interfered with "one of the basic civil rights of man," id. at 541, 62 S.Ct. at 1113. Over the years, the Court has applied the fundamental interests doctrine to strike down various legislative "infringements" involving a number of "rights," such as voting, interstate travel, and access to the criminal appellate process.[6] Most recently, in Zablocki v. Redhail, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978), a majority of the Justices, relying on a line of cases dating back to the landmark anti-miscegenation case, Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), declared that "the right to marry is of fundamental importance," and held that any "statutory classification [that] significantly interferes with the exercise of [this] right ... cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." 434 U.S. at 383, 388, 98 S.Ct. at 679, 682.

■ No decision of the Supreme Court stands squarely for the proposition that state restrictions on divorce must be evaluated under the same exacting standards as restrictions on, for example, the right to travel, the right to vote, or the right to

5. In briefs filed with this Court, neither party challenged the district court's determination in this regard. At oral argument, however, counsel for appellee suggested that New Jersey's legislation interfered with Murillo's fundamental right "to be married and to end a marriage."

6. See Illinois Elections Bd. v. Socialist Workers Party, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) (striking down requirement that new parties and independent candidates garner more signatures to be placed on municipal ballot than on state ballot); Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (voiding certain durational residency requirements for voting); Kramer v. Union Free School Dist., 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (overturning statute that restricted voting in school district elections to property owners and parents of schoolchildren); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (invalidating a one-year residency requirement for welfare

eligibility); Harper v. Virginia Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (invalidating state poll tax); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (requiring states to appoint counsel to represent indigent criminal defendants in any direct appeal as of right); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (requiring states to provide trial transcripts to indigent criminal appellants). But see, e.g., San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (refusing to designate education as "fundamental" for equal protection purposes, and holding that "wealth discrimination alone provides an [in]adequate basis for invoking strict scrutiny," id. at 29, 93 S.Ct. at 1294); Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972) (no fundamental interest in "decent shelter"). See generally L. Tribe, American Constitutional Law §§ 16–7 to 16–12 (1978).

marry.[7] Drawing upon *Zablocki* and its predecessors, it might be argued that the relevant Supreme Court cases recognize that, for purposes of equal protection analysis, some sort of heightened scrutiny is appropriate with respect to legislation impinging on the availability of divorce.[8]

Whatever the merits of this argument,[9] it should be recognized that any such "fundamental right" to secure a divorce—whether a procedural "right" of access to a judicial forum to sue for divorce or some substantive "right" to divorce per se—is not at issue in this case. Quite simply, New Jersey's statute did not "significantly," "directly," or "substantially" infringe upon the right of individuals to obtain dissolutions of their marriages (quoting *Zablocki*, 434 U.S. at 386–87, 98 S.Ct. at 681). By imposing a fifty-dollar filing fee, New Jersey obviously did not prohibit its citizens from attempting to obtain a divorce in accordance with the State's standards and requirements. Nor did the fee constitute an extra obstacle to divorce, erected by the State, in addition to those difficulties and costs that inhere in the nature of divorce. Rather, New Jersey's statutory scheme provided for ready access to divorce in appropriate cases, but deemed divorce to be a service which should be paid for at least in part by each individual who sought to obtain it. Such a determi-

**7.** *See Developments in the Law: The Constitution and the Family*, 93 Harv.L.Rev. 1156, 1308–13 (1980) (observing that "[t]he Supreme Court has not recognized a substantive constitutional right to divorce," but recommending that divorce be given "greater protection than offered by the [*Sosna v. Iowa*] rational basis test"); *see also* Strickman, *Marriage, Divorce and the Constitution*, 22 B.C.L.Rev. 935, 978–1008 (1981).

**8.** Support for such an argument focuses upon *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), *United States v. Kras*, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973), and *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). *See* Strickman, *supra* note 7, at 978–88. Wholly apart from the specific language contained in *Boddie, Kras*, and *Zablocki*, it might also be argued that, insofar as a "right to marry" has been recognized under the Constitution, *see Zablocki*, similar protection should be afforded to individual decisionmaking with respect to divorce. *See Developments in the Law, supra* note 7, at 1310–11 ("A liberal right to divorce may be a prerequisite to full exercise of the right to marry; to the extent divorce is unavailable, the right to remarry is burdened").

**9.** It could be argued that the *Boddie-Kras-Zablocki* line of cases does *not* stand for the proposition that divorce is a fundamental right. Although *Boddie* recognized that marriage was an important relationship, the Court, in holding that a state violated due process by denying court access to indigents unable to pay divorce filing fees, did not explicitly recognize a fundamental right to marry, much less a fundamental right to divorce. Similarly, while *Kras* might be read to support the proposition that the imposition of an absolute bar to the judicial process for the dissolution of a marriage is incompatible with the demands of the due process clause, the opinion need not be interpreted as establishing the fundamental nature of di-

vorce for equal protection purposes. *See Developments in the Law, supra* note 7, at 1310. Under *Zablocki*, to be sure, the right to marry is elevated to a "fundamental" status; the *Zablocki* opinion is silent, however, as to the presence of a fundamental right to divorce.

Indeed, this counterargument continues, it is difficult to reconcile the notion that divorce laws should be subjected to heightened scrutiny with the Supreme Court's decision in *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). In upholding the constitutionality of Iowa's one-year residency requirement for divorce, the Court found the statute could "*reasonably* be justified" by the State's interests in not becoming "a divorce mill for unhappy spouses" and in "insulat[ing its] divorce decrees from the likelihood of collateral attack." *Id.* at 406–09, 95 S.Ct. at 560–562 (emphasis added). Iowa's restriction on *divorce* apparently was subjected to far less rigorous scrutiny in *Sosna* (where the Court upheld a law it deemed "reasonable") than was Wisconsin's restriction on *marriage* at issue in *Zablocki* (where the Court overturned a statute that was neither "supported by sufficiently important state interests [nor] closely tailored to effectuate only those interests," 434 U.S. at 388, 98 S.Ct. at 682).

Finally, it could be maintained that recognition of a fundamental right to divorce is not necessary to protect the fundamental right to marry. Under *Zablocki*, any regulation that "significantly" or "directly or substantially" interferes with decisions to remarry will be upheld only if "supported by sufficiently important state interests and ... closely tailored to effectuate only those interests." 434 U.S. at 388, 98 S.Ct. at 682. If regulations of divorce which fail the *Zablocki* test are struck down, therefore, there may be no need for a fundamental right to divorce in order to protect the right to marry.

nation did not constitute an infringement on any "right" to sue for or to obtain a divorce. Instead, it reflected an apparent judgment that the costs of exercising that right, like the costs of exercising many constitutionally protected rights, would not be borne entirely by the State merely because a constitutional right was alleged to be present.[10] To challenge such an arrangement—that is, to contend that the imposition of a fifty-dollar trial fee transgressed per se an individual's right to seek a divorce—is to assert, in effect, that a constitutional right to a divorce would necessarily entail a concomitant constitutional obligation on the part of a state to subsidize the full costs of providing applicants with divorces. The argument, reduced to its essence, amounts to an assertion that individuals have not only a fundamental right to divorce, but a fundamental right to a free divorce despite the very real costs to the State of providing that service. Even if we assume *arguendo* that there exists a fundamental right to divorce, we do not believe, and we are aware of no case suggesting, that a state is constitutionally required not only to grant divorces to its citizens upon request, but to do so without collecting from those persons a portion of the expenses realized in making available to them such a service.[11]

An additional consideration might be present if it were demonstrated that the fee arrangement discouraged indigents from obtaining a divorce by imposing a financial requirement that they would find impossible to satisfy. Such is not the case here: the statute in question contained an explicit exemption for persons unable to afford the fee.[12] Moreover, nothing in the record indicates that any member of the class represented by Murillo was prevented from becoming divorced or remarried by reason of the State's divorce-fee system. To be sure, even non-indigent individuals may have found that the divorce fee required them to forego other uses to which they would have put their limited financial resources.[13] But this hardship, although unfortunate, falls short of establishing that such persons have been precluded from obtaining divorces. It does show that the choice to file for a divorce might have been somewhat easier if New Jersey subsidized a greater portion of the costs of divorce. Again, however, we are not persuaded that any fundamental right to a divorce carries with it what in essence would have to be the right to a divorce that is free to the litigant. Furthermore, if the burden of the fifty-dollar

**10.** According to statistics produced by the State at trial, *see* Defendant's Trial Exhibit D–1, and credited by the district court, *see* 508 F.Supp. at 836 & 836 n.10, during fiscal year 1979, in disposing of 26,275 matrimonial cases, New Jersey expended approximately $5.70 million for judicial and staff salaries and fringe benefits, clerk's office expenses, court reporter fees, and general administrative costs. $3.02 million of this amount was recouped through the payment by divorce litigants of general filing and divorce trial fees. In other words, matrimonial litigants contributed only 53% of the total costs incurred by the State in providing a forum for its citizens to obtain a divorce. We are not presented, therefore, with a situation where a state assesses a fee significantly greater in amount than the cost of the service being provided.

**11.** *Cf. Harris v. McRae*, 448 U.S. 297, 316, 100 S.Ct. 2671, 2687, 65 L.Ed.2d 784 (1980) (holding that, even though *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and its progeny recognized a woman's right to secure an abortion under certain conditions, "it simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices"); *see also Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977).

**12.** *See* N.J.S.A. 2A:34–16 (repealed 1980). It is the presence of this exemption for indigents that distinguishes New Jersey's statute from the filing fee arrangement invalidated by the Supreme Court in *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

**13.** At the time Murillo instituted these proceedings, "she earned twenty-five to twenty-eight dollars per day as a domestic, and did not qualify as an indigent." 508 F.Supp. at 832. According to the district court, New Jersey "had thus placed plaintiff in a dilemma: either she would have had to pay what was to her a substantial sum to sue for divorce; or she would have remained hostage to a marriage which under the substantive law of the State she was entitled to have dissolved." *Id.*

divorce fee were deemed an encroachment on a non-indigent's right to obtain a divorce, there is no reason why a similar objection could not be registered against the seventy-five-dollar *filing* fee currently required of all litigants, including matrimonial litigants, who seek resolution of their disputes in New Jersey's Superior Courts. Indeed, it is difficult to understand why the fifty-dollar fee would constitute any more of a "significant," "substantial," or "direct" encumbrance on an individual's "right" to a divorce than does the very fact that New Jersey requires every party to a divorce to submit to public, sometimes lengthy, and occasionally burdensome legal proceedings in the first place.

■ Finally, it might be maintained that New Jersey trespassed upon its citizens' fundamental right to divorce—assuming, once again, that such a right exists—by imposing the supplemental trial fee on matrimonial litigants, but not on other civil litigants. This contention suffers from a logical flaw, however. A divorce action and, for example, a tort or contract action, obviously are not interchangeable alternatives. The higher cost for a divorce, as opposed to other civil actions, would hardly encourage those seeking a divorce to abandon their efforts in favor of other, less expensive forms of litigation. The level of the fee charged for, say, a tort action, therefore, is irrelevant to the presence of any burden on the right to obtain a di-

vorce.[14] Rather, the dispositive question—having nothing to do with a state's overall posture in regard to the imposition of filing fees—is whether a fundamental right is infringed when a state charges an individual at least some amount of money in order to defray the costs of terminating his or her marital relationship. And this question we have answered in the negative.

Accordingly, we hold that the statute under attack in this proceeding need not be evaluated under the heightened standard appropriate for legislation that infringes on fundamental constitutional rights. We proceed, therefore, as did the district court, to assess the constitutionality of the legislation under the "rational relation" standard of equal protection review.

### B

■ Having determined that New Jersey's statute poses no interference with a fundamental right sufficient to invoke rigorous scrutiny, the rational basis test becomes, in our view, the appropriate standard by which to measure the legislation for purposes of plaintiffs' equal protection challenge. *See Schweiker v. Wilson,* 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981). The rational basis test simply requires "that legislation classify the persons it affects in a manner rationally related to legitimate governmental objectives." *Id.* at 230, 101 S.Ct. at 1080.[15] According to the

14. A different situation might be presented if a state were subsidizing at uneven rates two alternatives where the choice between those alternatives was constitutionally protected. Even were that the case here, however, it is not clear that the State would be deemed to have infringed on the right to make that choice. *See Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (holding that the federal government may subsidize childbirth without also subsidizing abortion); *see also Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977).

15. The deference accorded legislators under the rational basis test was perhaps most strongly stated in *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961): "A statutory discrimination will not be set aside if any state of facts *reasonably may be conceived* to justify it." *Id.* at 426, 81 S.Ct. at 1105 (empha-

sis added). *See also Hodel v. Indiana,* 452 U.S. 314, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981): "Social and economic legislation [that] does not employ suspect classifications or impinge on fundamental rights ... carries with it a presumption of rationality that can only be overcome by a *clear showing* of arbitrariness and irrationality." *Id.* at 331–32, 101 S.Ct. at 2386 (emphasis added). Judicial review under the rational relation standard has never been entirely "toothless," however. *See, e.g., Jimenez v. Weinberger,* 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974) (Social Security statute held unconstitutional, despite application of mere rationality test, because evidence did not justify differential treatment of two similarly situated groups of illegitimates); *United States Dep't of Agriculture v. Moreno,* 413 U.S. 528, 538, 93 S.Ct. 2821, 2827, 37 L.Ed.2d 782 (1973) (food stamp statute invalidated because proffered justifications were "wholly without any ration-

district court, the supplemental trial fee previously imposed by New Jersey on divorce litigants does not pass constitutional muster even under the rational relation standard of review. We disagree; we do not believe that "the varying treatment of different groups or persons" challenged here "is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the legislature's actions were irrational," *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979).

The first task of a court in evaluating an equal protection claim under the rational relation test is to identify with particularity the precise classification alleged to be irrational. Obviously, it would constitute an irrational act—and hence would offend the Constitution's promise of "equal protection of the laws"—were a state to impose differing burdens upon individuals who are, in all relevant respects, indistinguishable.[16] Plaintiffs are here challenging a New Jersey law that assessed a fifty-dollar fee against all non-indigent litigants in divorce proceedings, but not against litigants in other civil proceedings, such as tort, contract, or property actions. We must determine, therefore, whether or not persons who brought divorce actions in New Jersey

were similarly situated to persons who pressed other civil complaints in the State's courts. Or, to phrase the same question somewhat differently, we must decide whether or not the New Jersey Legislature rationally could have chosen, for example, to impose higher financial obligations upon divorce litigants than on contract litigants.

■ After reviewing the record in this case, we are persuaded that the New Jersey Legislature did not proceed irrationally, both when it instituted the divorce fee arrangement, and when it retained that arrangement over the course of a number of decades. In light of the evidence available to it, we believe it would not have been unreasonable for the Legislature to have been of the opinion that the State's divorce system imposed financial as well as non-financial demands upon the judiciary, thereby justifying additional monetary support from the users of that system. In this connection, it is instructive to consider the origins of the supplemental fee and the place of that fee in the overall framework of New Jersey's divorce-related legislation.

For nearly the entire first half of this century, all divorce actions filed in New Jersey were referred for initial review to special masters. These masters were

al basis"); *see also Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n.16, 95 S.Ct. 1225, 1233 n.16, 43 L.Ed.2d 514 (1975) ("[t]his Court need not in equal protection cases accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the asserted purpose could not have been a goal of the legislation").

In recent decisions, the Supreme Court has demonstrated some uncertainty as to the precise nature of rational relation review. While some Justices, following *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911), would uphold a legislative classification "if any state of facts reasonably can be conceived that would sustain it," *id.* at 78, 31 S.Ct. at 340, other members of the Court would require that an economic and social classification "rest upon some ground of difference having a fair and substantial relation to the object of the legislation," *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920). *Compare United States R. R. Retirement Bd. v. Fritz*, 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980), *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 101

S.Ct. 715, 66 L.Ed.2d 659 (1981), *Schweiker v. Wilson*, 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981), *and City of Mesquite v. Aladdin's Castle, Inc.*, —— U.S. ——, ——, 102 S.Ct. 1070, 1077, 71 L.Ed.2d 152 (1982). *See generally Fritz, supra*, 449 U.S. at 176 n.10, 101 S.Ct. at 460 n.10 (reviewing previous rational relation cases, and suggesting that "[t]he most arrogant legal scholar would not claim that all of these cases applied a uniform or consistent test under equal protection principles"); Choper, *supra* note 3, at 3–17; Leedes, *The Rationality Requirement of the Equal Protection Clause*, 42 Ohio St.L.J. 639 (1981).

16. For example, it would be difficult to defend as "rational" a state statute that extracted a $50 divorce fee from individuals with surnames beginning with A to M, but collected only $20 from persons whose names begin with N to Z—at least in the absence of any information that might reasonably distinguish members of the first group from members of the second with respect to matters of divorce.

charged with, among other things, the responsibility for screening out fraudulent and consensual divorce cases before trial. According to the district court,

> [s]ince the State had an interest in preventing divorces on grounds other than [adultery, desertion, and extreme cruelty], it considered itself a party, albeit not in name, to every suit for divorce. The State was omnipresent, standing over the shoulders of the litigants—in the body of the advisory master—to prevent collusive divorces.

508 F.Supp. at 834. In order to finance this mastership arrangement, Chancery Court rules required litigants to make a fifty-dollar payment to the appropriate court clerk prior to requesting a hearing before a master and a trial before a chancellor. *Id.*

In 1948, the New Jersey Legislature abolished the mastership system and, at the same time, formally adopted the divorce fees at issue on this appeal. Before their cases would be set for trial, matrimonial litigants were obligated to remit fifty dollars "for the use of the state," and an additional ten dollar fee for stenographic services was imposed in "litigated" actions. No official explanation accompanied this enactment. Consequently, as the district court observed, "the exact purpose of the legislature in 1948 is now enshrouded in the mists of time." 508 F.Supp. at 834. Nonetheless, from testimony proffered at trial, the district judge concluded that

> the legislature intended that, as the system of advisory masters was abolished, the existing judicial structure would be required to perform tasks previously executed by the masters. The fee system created by the newly-enacted statute would institutionalize financial support for a category of cases requiring closer

judicial scrutiny and a greater allocation of court resources.

*Id.* Even though special masters were no longer employed in divorce proceedings, the fifty-dollar trial fee could be explained, according to the district court, by reason of New Jersey's continuing interest in the oversight of all divorce suits. In short, "the 1948 statute represented a change only in procedure [and] not in substantive state policy." *Id.* The plaintiffs apparently agree with the district court's conclusion in this regard: in no way do they imply that the State's trial fee arrangement was somehow irrational or unconstitutional prior to 1971.

New Jersey's substantive law of divorce remained unchanged until 1971. In that year the Legislature amended the Divorce Act in order to give effect to a number of "no-fault" reforms.[17] Perhaps the most significant of these changes permitted the granting of a divorce upon a showing that the two spouses had not cohabitated for an eighteen-month period and that "there is no reasonable prospect of [their] reconciliation." N.J.S.A. 2A:34–2(d). This proviso was intended to eliminate the potential for questionable behavior that occasionally had resulted when one party was forced to "accus[e] . . . the other of a marital wrong" in order to obtain a divorce. *Final Report to the Governor and the Legislature of the Divorce Law Study Commission* 6 (May 11, 1970). The 1971 reform legislation did not alter or affect the previously-established trial-fee arrangement, however, and for the next nine years, those fees continued to be collected from individuals who filed for divorce pursuant to the requirements of the amended Act.

■ The district court concluded that a "dramatic change" was wrought in New

---

17. In addition to the three existing "fault" grounds for divorce—adultery, desertion, and extreme cruelty (the latter two of which were revamped)—certain "no-fault" justifications were recognized under the amended Act: an eighteen-month separation; a twelve-month narcotic or alcoholic addiction; a twenty-four-month institutionalization; and an eighteen-month imprisonment. Additionally, a fourth "fault" provision was adopted (deviant sexual conduct), a number of common-law defenses to divorce were abolished (recrimination, condonation, and clean hands), and various revisions were made involving alimony, nullification, child legitimation, and the distribution of marital property. *See* N.J.S.A. 2A:34–1 to 34–7; Note, *The 1971 New Jersey Divorce Law*, 25 Rutgers L.Rev. 476, 479 (1971); *see also* Skoloff, *The Divorce Reform Law: A Brief Review*, N.J.L.J., Aug. 5, 1971, at 1.

Jersey's law of divorce by the 1971 amendments—particularly because of the newly enacted eighteen-month separation provision. Whereas New Jersey prior to 1971 had "sought scrupulously to prevent the consummation of collusive divorces," after that date "the legislature abandoned this policy" and endorsed "a much more liberal conception of divorce than had theretofore existed." 508 F.Supp. at 834–35, 838. Even accepting the district judge's characterization of the 1971 Act,[18] it does not follow that the Legislature acted irrationally when it retained the trial fee arrangement—and indeed, the district court did not so hold.[19] The Legislature reasonably could have believed that, even with the adoption of a more "liberal" system of divorce, di-vorce-related litigation would continue to impose a financial burden upon the State's judicial machinery—a burden that could be offset, in part, through the collection of a user's fee. Or, the Legislature reasonably could have believed that the increasing costs to the judicial system as a whole justified the recovery of additional monies and that an appropriate place to begin would be in the divorce field, where the litigants had already accepted and were meeting the additional cost burden. Whatever the reason, plaintiffs point to no evidence available to the 1971 Legislature from which it could have deduced that its hitherto-rational fee-assessment policy would prove unnecessary or counter-productive in the years to follow.[20]

**18.** Counsel for the State argues that the district court's characterization of the 1971 amendments is open to serious challenge. While the Legislature did indeed modify a number of the ground rules for divorce, counsel suggests that the State's paramount interest in and responsibility for matrimonial matters remained unchanged. The State, for example, specifically did not "abandon" its obligation to prevent collusive divorces; on the contrary, despite the recommendation of the Divorce Law Study Commission, the Legislature retained the defenses of laches, connivance, and collusion. See Note, *The 1971 New Jersey Divorce Law*, supra note 17, at 495–96 & n.121 (discussing N.J.S.A. 2A:34–7 as amended). Neither did the Legislature mean to suggest, as subsequent State court cases made clear, that the judiciary's only appropriate function was to rubber-stamp the applications of individuals seeking dissolution of their marital bonds. See *Rothman v. Rothman*, 65 N.J. 219, 228, 320 A.2d 496, 501 (N.J.1974); *Manion v. Manion*, 143 N.J.Super. 499, 501–02, 363 A.2d 921, 923 (Sup. Ct.Ch.Div.1976); *Morrison v. Morrison*, 122 N.J.Super. 277, 281, 283, 300 A.2d 182, 184–85 (Sup.Ct.Ch.Div.1972). According to counsel, therefore, whatever the "dramatic change" worked in New Jersey's substantive law of divorce by the 1971 amendments, nothing indicates that there was any significant lessening of either the State's considerable interest or the scope of judicial responsibility in this area. In view of our disposition of this case, we see no reason to express an opinion as to this argument.

**19.** The district court condemned the trial fee arrangement on the basis of actual events that transpired *after* 1971—events which demonstrated, in the district court's view, that "the State's belief that it was collecting these fees to defray the higher cost of providing judicial services to matrimonial litigants was [in fact] false." 508 F.Supp. at 836. Further attention is given to this portion of the district court's analysis *infra*. For present purposes, it is sufficient to note that the district court did *not* conclude that the 1971 Legislature *should have recognized* the apparent inconsistency between the substantive law of divorce it adopted and the matrimonial fee system it retained.

**20.** It is not significant for purposes of our determination today that there exists no legislative history indicating why the 1971 Legislature retained the divorce fee arrangement. While such commentary would of course be helpful were it available, see *Schweiker v. Wilson*, 450 U.S. 221, 244 & n.6, 101 S.Ct. 1074, 1087 & n.6, 67 L.Ed.2d 186 (1981) (Powell, J., dissenting), a state is under no obligation to "articulate its reasons for enacting a statute," *United States R. R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980), and consequently legislative records are often sparse at the state level, see, e.g., *Craig v. Boren*, 429 U.S. 190, 199 n.7, 97 S.Ct. 451, 457 n.7, 50 L.Ed.2d 397 (1976). Although plaintiffs appear troubled by the proposition that, in the absence of legislative history, suggestions as to possible legislative motivations must necessarily be advanced by counsel for the State, we recently concluded that "[s]o long as we are careful not to attribute to the legislature purposes which it cannot reasonably be understood to have entertained, we find that in examining [a] challenged provision[] we may consider purposes advanced by counsel . . . or suggested initially by ourselves." *Delaware River Basin Comm'n v. Bucks County Water & Sewer Auth.*, 641 F.2d 1087, 1097 (3d Cir. 1981) (footnote omitted).

In this connection, it is worth noting that the district court's requirement that the State iden-

Even were it to be shown that the 1971 Legislature had no evidentiary basis for concluding that greater expenditures of judicial time and money were necessary for a divorce case than, for example, the average civil case, our conclusion that the State had a rational reason for retaining the supplemental fee provision would be unaffected.[21] The equal protection clause does not require "things which are different in fact ... to be treated in law as though they were the same." *Tigner v. Texas*, 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940). The Legislature, in 1971, could reasonably have determined, as Congress did with respect to the bankruptcy system, that continuation of the special fee for matrimonial litigants was appropriate in order to "make the [divorce] system self-sustaining and paid for by those who use it rather than by tax revenues drawn from the public at large,"

*United States v. Kras*, 409 U.S. 434, 448, 93 S.Ct. 631, 639, 34 L.Ed.2d 626 (1973). In this regard, inquiry into whether the Legislature had reason to believe that the average cost of divorce cases exceeded that of other civil cases is misplaced. Under the rational relation test, a state legislature is not obliged to arrive at exacting calculations about comparative costs and benefits before imposing a user's fee for a particular state-sponsored service. Lawmakers are not required to design fee structures with the scrupulous eye of the accountant, always matching revenues and costs. *See Vance v. Bradley, supra,* 440 U.S. at 110 n.28, 99 S.Ct. at 949 n.28 ("The State is not compelled to verify logical assumptions with statistical evidence'") (quoting *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 812, 96 S.Ct. 2488, 2499, 49 L.Ed.2d 220 (1976)). Similarly, we believe that the New

---

tify a " 'legitimate, *articulated* state purpose' " that its divorce fee was intended to further, 508 F.Supp. at 834, 837 (quoting *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973) (emphasis added)), may run afoul of more recent Supreme Court pronouncements in this area. *See, e.g., Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464, 469–70, 101 S.Ct. 1200, 1204, 67 L.Ed.2d 437 (1981) (plurality opinion) ("the search for the 'actual' or 'primary' purpose of a statute is likely to be elusive"); *Fritz, supra,* 449 U.S. at 179, 101 S.Ct. at 461 ("Where ... there are plausible reasons for [legislative] action, our inquiry is at an end. It is, of course, 'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision' " (quoting *Flemming v. Nestor,* 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960))); *but see Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7, 101 S.Ct. 715, 723 n.7, 66 L.Ed.2d 659 (1981). *Compare Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 682 n.3, 101 S.Ct. 1309, 1321 n.3, 67 L.Ed.2d 580 (1981) (Brennan, J., concurring in the judgment) *with id.* at 703 n.13, 101 S.Ct. at 1332 n.13 (Rehnquist, J., dissenting); *see also* G. Gunther, Cases and Materials on Constitutional Law: 1981 Supplement 53 (1981) ("During the 1980–81 Term, extensive debates erupted in a remarkably large number of cases on the question of whether a legislature's 'actual purpose' is relevant to the constitutionality of a challenged law").

**21.** It should be stressed that, in any equal protection action evaluated under the rational relation test, " 'those challenging the legislative

judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.' " *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981) (quoting *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979)). Plaintiffs did not satisfy their burden merely by asserting that the 1971 legislative action in question made divorce "easier and less complicated" to obtain.

The district court's protestation that the State "failed adequately to explain why matrimonial litigants alone had been singled out" when other groups of litigants—such as "[c]lass actions, actions involving minors and incompetents, [and] probate and adoption matters"—require extra judicial scrutiny, 508 F.Supp. at 837 n.11, misses the mark. It is well established that "a legislature 'may implement [its] program step by step, ... adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.' " *Clover Leaf Creamery Co., supra,* 449 U.S. at 466, 101 S.Ct. at 725 (quoting *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976)); *see also Williamson v. Lee Optical Inc.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955); *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 110, 69 S.Ct. 463, 465, 93 L.Ed. 533 (1949). Under this doctrine, New Jersey need not have adopted a trial fee system in other areas, such as class actions, in order to preserve the constitutionality of its supplemental divorce fee.

Jersey Legislature was not obligated to ascertain that divorce litigation was in fact more costly than other civil litigation before deciding to charge those individuals who hoped to obtain a divorce a portion of the costs incurred by the State in providing divorces.[22]

Because the Legislature has not been shown to have acted irrationally when it permitted the divorce fee arrangement to remain on the books at the time it amended the Divorce Act, we turn to a final consideration: whether that arrangement somehow "became" irrational by reason of subsequent events. In this regard, the district judge concluded that, in 1979 when this suit was filed, the matrimonial fee system could no longer be justified:

> If it were true that prior to New Jersey's institution of no-fault divorce, matrimonial cases took up more of a judge's time than other types of cases, it is readily apparent that this is no longer the case.... The majority of all divorce cases are now uncontested, and plaintiffs in such cases are rarely before the judge for more than a few moments. Although a minority of actions, filed on the basis of fault, may still require special judicial scrutiny, most matrimonial litigants require no extraordinary judicial supervision. Indeed, it was demonstrated at trial that *the average cost of disposing of a matrimonial case was significantly less than the average cost of adjudicating other civil actions.*

508 F.Supp. at 836 (footnotes omitted).[23] Carrying this line of thought to its logical point of termination, the district court held that, because "the State's belief that it was collecting these fees to defray the higher cost of providing judicial services to matrimonial litigants was [demonstrably] false," *id.*, New Jersey's statute could not be reconciled with the rationality requirement imposed on states by the Constitution.

■ We find this aspect of the district court's analysis troubling on two grounds. First, primarily for the reasons discussed previously, we do not believe that New Jersey's divorce fee arrangement could be considered irrational simply because "the average cost of disposing of a matrimonial case was significantly less than the average cost of adjudicating other civil actions," 508 F.Supp. at 836. The relevant question, in our view, is not whether divorce proceedings were more costly than other civil cases, but rather whether the State was justified in imposing a fee upon those individuals who seek to secure a dissolution of their marriage. Absent a showing that the State's trial fee was patently exclusionary because of its very size, *see Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), or a showing that the State was, in effect, accumulating revenues from the fee far in excess of the amount actually spent by the State on divorce-related judicial proceedings,[24] there is no constitutional reason

---

**22.** The Supreme Court on a number of occasions has rejected an equal protection challenge to a statute that imposed fees on the users of a specific judicial service. *See, e.g., United States v. Kras*, 409 U.S. 434, 446–49, 93 S.Ct. 631, 638–640, 34 L.Ed.2d 626 (1973) (bankruptcy filing fees permissible because they "make the system self-sustaining and paid for by those who use it rather than by tax revenues drawn from the public at large"); *Ortwein v. Schwab*, 410 U.S. 656, 660, 93 S.Ct. 1172, 1174, 35 L.Ed.2d 572 (1973) (appellate court filing fee); *Manes v. Goldin*, 400 F.Supp. 23, 30–31 (E.D.N.Y.1975), *aff'd*, 423 U.S. 1068, 96 S.Ct. 851, 47 L.Ed.2d 80 (1976) (filing fees designated for a city's general fund instead of being earmarked for support of the courts); *Schilb v. Kuebel*, 404 U.S. 357, 370–71, 92 S.Ct. 479, 487, 30 L.Ed.2d 502 (1% administrative fee

imposed on all criminal defendants seeking a bail bond).

**23.** Whereas divorce fees provided 53% of the costs of operating the matrimonial trial system, *see* note 10 *supra*, litigants accounted for 30% ($4.90 million in revenues out of $16.41 million in costs) of the monies spent by the State in providing courts to adjudicate general civil law and equity matters.

**24.** Even in the event of this latter showing—*i.e.*, if it could be established that New Jersey used monies derived from divorce litigants in order to fund other, unrelated activities, such as highway maintenance—the State might still be able to defend its statute against a constitutional attack by arguing that, what it has denominated to be a "fee," in actuality is a "tax" designed to raise general revenue. In

why New Jersey should be prohibited from collecting from litigants a substantial portion of the money it expends in providing divorce-court services. And New Jersey's scheme becomes no less rational simply because the State has chosen to collect from other civil litigants a different percentage of the costs of their respective judicial services.

Second, even were we persuaded that the divorce fee arrangement could not be justified as long as divorce cases in fact are less costly than other civil matters, we could not accept the district court's application of this principle to the facts of the present appeal. By concluding, in effect, that New Jersey's Legislature acted unconstitutionally when it retained in existence a statute admittedly valid when enacted but arguably grounded on assumptions that eventually turned out to have been incorrect, the district court imposed an unwarranted obligation upon legislative bodies: the obligation constantly to reassess the continuing validity of the factual premises underlying each piece of legislation enacted over the years. Only through such a painstaking effort, apparently, could New Jersey have discovered the alleged error that developed and corrected it, thereby foreclosing the possibility of judicial intervention and invalidation.

In our view, however, just as the Constitution neither demands nor expects perfection on the part of a legislature engaged in adopting laws that classify,[25] so too the Constitution neither demands nor expects omniscient oversight on the part of a legislature once those laws have taken effect. " 'The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.' " *United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 179 n.12, 101 S.Ct. 453, 461 n.12, 66 L.Ed.2d 368 (1980) (quoting *Vance v. Bradley, supra*, 440 U.S. at 97, 99 S.Ct. at 942). All that is required in either instance—whether at the time of enactment or at the time of oversight—is that the legislature act reasonably.

Based on the record in this appeal, we conclude that the New Jersey Legislature did not act unreasonably under the circumstances described. Specifically, once the Legislature concluded that its original assumption about the relative impact of divorce litigation was no longer applicable, it did exactly what the plaintiffs sought in this lawsuit: it repealed the trial fee statute.[26] Moreover, this entire process of en-

this connection, it may be significant that, according to the terms of N.J.S.A. 2A:34–16, monies collected from divorce petitioners were intended "for the use of the state." *See generally National Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340–41, 94 S.Ct. 1146, 1148–1149, 39 L.Ed.2d 370 (1974) (discussing the significant differences between a tax and a fee); *California v. Buzard*, 382 U.S. 386, 395, 86 S.Ct. 478, 484, 15 L.Ed.2d 436 (1966) (holding that a State's license "fee" arrangement was in reality a tax "raised to defray the general expenses of government").

**25.** *See Western & Southern Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 671–72, 101 S.Ct. 2070, 2084–2085, 68 L.Ed.2d 514 (1981) ("whether *in fact* the provision will accomplish *its objectives is not the question:* the Equal Protection Clause is satisfied if we conclude that the [legislature] *rationally could have believed* that the [law] would promote its objective"); *Harris v. McRae*, 448 U.S. 297, 326, 100 S.Ct. 2671, 2693, 65 L.Ed.2d 784 (1980) ("we cannot, in the name of the Constitution,

overturn duly enacted statutes simply 'because they may be unwise, improvident, or out of harmony with a particular school of thought' " (quoting *Williamson v. Lee Optical Co.*, 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955))).

**26.** Plaintiffs—in addition to the district judge, 508 F.Supp. at 838, and the dissent, at 918 n.4—rely heavily on a statement by the Public Safety and Defense Committee which accompanied the Legislature's repeal of the State's supplemental divorce fee. That statement asserts that the original purpose of the matrimonial fee was to fund the special mastership system; it suggests that, with the elimination of that system, the fee constitutes an "anachronism" and perhaps an "unreasonable classification." We do not find the Committee's observations dispositive, one way or the other, of the rationality issue. To begin with, it should be noted that the statement labels the fee arrangement "anachronistic" and "unreasonable," and not "irrational" or "unconstitu-

actment, reassessment, and rescindment occurred within nine years—not an unreasonable period, considering the limited time and resources available to a state legislative body, and the lack of any evidence indicating that the Legislature actually knew well before 1980 that an adjustment in the divorce fee should be considered. There may be a role for the courts to play when a statute, rendered manifestly unreasonable by changed conditions, remains in effect for many years without legislative action.[27] But where, as here, the Legislature has proceeded with promptness, judicial intervention is neither necessary nor appropriate.

In short, because a rational reason can be identified for the institution and the retention of New Jersey's supplemental divorce fee—namely, the need for reimbursement of a portion of the expenses incurred by the State in providing divorce-related services [28]

---

tional"—a distinction of no small difference, in view of the fact that there are many laws considered by some to be anachronistic or unreasonable that would concededly survive review under the equal protection clause (see, e.g., the statutory rape law, applicable only to males, at issue in *Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981)). More to the point, the opinion of the 1980 Legislature as to the original purpose underlying the matrimonial-fee statute is not controlling, inasmuch as " 'the views of a subsequent [legislature] form a hazardous basis for inferring the intent of an earlier one.' " *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117, 100 S.Ct. 2051, 2060, 64 L.Ed.2d 766 (1980) (quoting *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960)); *see also Haynes v. United States*, 390 U.S. 85, 87 n.4, 88 S.Ct. 722, 725 n.4, 19 L.Ed.2d 923 (1968); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 348–49, 83 S.Ct. 1715, 1733, 10 L.Ed.2d 915 (1963). It is even more questionable to infer legislative intent from "[a] mere statement in a conference report . . . as to what [a] Committee believes an earlier statute meant." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, supra, 447 U.S. at 118 n.13, 100 S.Ct. at 2060 n.13 & 119–20; *see also Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 758, 99 S.Ct. 2066, 2072, 60 L.Ed.2d 609 (1979). Finally, undue reliance by the courts on legislative statements as to the reasons for or the worth of a previously enacted statute might well inhibit the free exchange of ideas within a legislative body, and indeed could discourage any legislative action whatsoever to correct the problem perceived here—retention of (allegedly) anachronistic laws. After all, it cannot be doubted that the report of New Jersey's Public Safety and Defense Committee would have been much more circumspect, and that perhaps its recommendation of repeal might have been modified or withheld, had its authors realized that their words would later form an important—perhaps the overriding—basis for a court's declaration as to the unconstitutionality of a previously enacted statute.

**27.** In this connection, counsel for the State argues that the district court misapplied equal protection doctrines by focusing on the actual workings of a statute at the time of trial, as opposed to the intended and foreseeable consequences at the time of its enactment. We find it unnecessary to appraise this contention. We note, however, that the Supreme Court appears not to have determined definitively whether changed conditions are a relevant consideration in equal protection analysis. *Compare Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981) ("Where there was evidence before the legislature reasonably supporting the classification, litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken") *and Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911) ("if any state of facts reasonably can be conceived that would sustain [a statute], the existence of that state of facts *at the time the law was enacted* must be assumed") (emphasis added) *with G. D. Searle & Co. v. Cohn*, —— U.S. ——, ——, 102 S.Ct. 1137, 1141, 71 L.Ed.2d 250 (1982) (Court considers whether a statute "no longer is rationally related to a legitimate state objective," in light of intervening event) *and United States v. Carolene Prods. Co.*, 304 U.S. 144, 153, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938) ("the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist"); *see generally* Bice, *Rationality Analysis in Constitutional Law*, 65 Minn.L. Rev. 1, 33–37 (1980).

**28.** The district court, 508 F.Supp. at 837–38, and the dissent, at 917 n.3, discuss and rebut a second justification for the divorce fee proffered by the State: that the fee "encourages reflective thought" on the part of individuals contemplating dissolution of their marriage. We find no reason to evaluate this alternative defense of the statute, however, since we already have identified a legitimate purpose that was served by the challenged classification. " 'The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.' " *Lehnhau-*

—we hold that the State has satisfied the rational relation test.[29]

### III

Early in the last century, Chief Justice Marshall set forth his now-classic exposition of the appropriate role assigned to the courts in our constitutional scheme when state statutes are challenged. He declared that

> whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. . . . [I]t is not on slight implication and vague conjecture, that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatability with each other.

*Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 128, 3 L.Ed. 162 (1810). Because we do not feel such a "clear and strong conviction" regarding the "incompatability" of the New Jersey statute with the United States Constitution, we hold that the State's trial fee was not inconsistent with the requirements of "the equal protection of the laws." Accordingly, the judgment of the district court will be reversed, and the matter will be remanded to that court for further proceedings consistent with this opinion.

SLOVITER, Circuit Judge, dissenting.

I would affirm the judgment of the district court that the fees held in escrow by defendant be refunded with interest to the individuals who had deposited them because I believe that the statute pursuant to which they were collected violates the Equal Protection Clause.

The district court concluded that New Jersey's matrimonial fee system neither employed any suspect classification nor impinged on any fundamental right, and

therefore it used the rational basis standard in its constitutional analysis. *Murillo v. Bambrick*, 508 F.Supp. 830, 833 (D.N.J. 1981). The district court correctly held that no suspect classification is involved in this case. However, I conclude from the line of Supreme Court precedent holding that the right to marry is fundamental that the correlative right to obtain a divorce is fundamental, that therefore the classification imposed in the statute before us is subject to heightened judicial scrutiny, and that it cannot survive such scrutiny.

In *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), the Supreme Court held that a Connecticut statute imposing filing and service fees of approximately sixty dollars on civil litigants violated the Due Process Clause when it was applied to indigents seeking to bring an action for divorce. The Court held that because the state had a monopoly of the means for legally dissolving the marriage relationship, it could not deny some of its citizens access to its courts for that purpose by imposing fees which they were unable to pay. Justices Douglas and Brennan would also have held that the Equal Protection Clause precludes conditioning access to the courts upon ability to pay in all manner of cases, not merely divorce actions. The opinion of the Court, however, predicated its holding on "the basic position of the marriage relationship in this society's hierarchy of values." *Id.* at 374, 91 S.Ct. at 784. Several times in that opinion, the Court emphasized the fundamental nature of the right at issue. It stated "marriage involves interests of basic importance in our society," *id.* at 376, 91 S.Ct. at 785, referred to the "special nature of the *divorce action*", *id.* at 381 n.8, 91 S.Ct. at 787 n.8, and characterized *divorce* as "the adjustment of a fundamental human relationship." *Id.* at 383, 91 S.Ct. at 788 (emphasis added).

The due process problem involved in *Boddie* is not presented by N.J.Stat.Ann.

---

sen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973) (quoting *Madden v. Kentucky*, 309 U.S. 83, 88, 60 S.Ct. 406, 408, 84 L.Ed. 590 (1940)).

**29.** Our analysis and holding with respect to the $50 trial fee apply equally to the $10 assessment for stenographic services collected by the State in contested divorce actions.

§ 2A:34–16 which contained an exemption for "actions in forma pauperis". Nonetheless, that case is significant because of the Court's recognition of the right to divorce as fundamental. Two years after *Boddie,* the Court affirmed that the holding in *Boddie* was predicated on the fundamental nature of the right to obtain a divorce. In *United States v. Kras,* 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973), the Court upheld a provision of the Bankruptcy Act, 11 U.S.C. § 32(b)(2), imposing filing fees for actions in bankruptcy against due process and equal protection challenges by indigents. The Court distinguished *Boddie,* stating:

> The denial of access to the judicial forum in *Boddie* touched directly, as has been noted, on the marital relationship and on the associational interests that surround the establishment and dissolution of that relationship. On many occasions we have recognized the fundamental importance of these interests under our Constitution.... [In contrast,] [w]e see no fundamental interest that is gained or lost depending on the availability of discharge in bankruptcy.
>
> . . . .
>
> ... Bankruptcy is hardly akin to free speech or marriage or to those other rights, so many of which are imbedded in the First Amendment, that the Court has come to regard as fundamental and that demand the lofty requirement of a compelling governmental interest before they may be significantly regulated.... This being so, the applicable standard ... is that of rational justification.

409 U.S. at 444–46, 93 S.Ct. at 637–638.

Most recently, in *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978), the Court reiterated that the right to marry (and with it the right to divorce) is fundamental, one of the "personal decisions protected by the right of privacy." *Id.* at 384, 98 S.Ct. at 679. At issue in that case was a Wisconsin statute which provided that any resident who had a judicially imposed support obligation for minor children not in his or her custody could not marry, within the state or elsewhere, without first obtaining court permission to marry. The Court emphasized that "[t]he freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men," *id.* at 383, 98 S.Ct. at 679 (quoting *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967)), and reaffirmed that the fundamental nature of the right to marry applied equally to the right to obtain a divorce. *Id.* 434 U.S. at 385 n.10, 98 S.Ct. at 680 n.10. The Court held that because "the right to marry is of fundamental importance" and the classification significantly interfered with the exercise of that right, it was necessary to undertake a "critical examination" of the state interests advanced in support of the classification. The Court held that the statutory classification could not be justified by the interests advanced in support of it, and therefore violated the Equal Protection Clause. *Id.* at 383, 390–91, 98 S.Ct. at 679, 683.

In light of this line of precedent, the reluctance of the majority to recognize the existence of a fundamental right to divorce is inexplicable. It is even more perplexing because the majority concedes the proposition that the right to marry is fundamental. It gives no cogent reason for differentiating between the right to marry and the right to divorce. See Majority op. at 903 n.9. Both logic and practicality require that marriage and divorce be considered correlative. *See Developments in the Law: The Constitution and the Family,* 93 Harv.L. Rev. 1156, 1311 (1980). In no state in this country can one marry if a previous marriage to someone still living has not been dissolved by divorce or annulment. Presumably the majority would agree that the right to marry is not limited to the right to marry only once. Furthermore, even married persons who do not wish to remarry have a fundamental right to resume singlehood.

Because the right to marry inheres in the right to privacy, and the Court has recognized that "it would make little sense" to recognize a right of privacy with respect to

some but not all matters of family life, *see Zablocki v. Redhail,* 434 U.S. at 386, 98 S.Ct. at 681, it follows that the same considerations apply to the right to dissolve the marriage relationship. The Court expressly intertwined those rights in *United States v. Kras,* 409 U.S. at 444, 93 S.Ct. at 637, when it referred to the "associational interests that surround the establishment and dissolution of the [marital] relationship" and the "fundamental importance of these interests under our Constitution." Therefore, I believe we must start our analysis of the statutory classification with the principle that we are dealing with a fundamental right, the right to divorce.

*Zablocki* teaches not only that the right to marry and divorce are to be considered as fundamental rights for purposes of equal protection analysis, but also that a heightened scrutiny is appropriate even when the statutory classification does not absolutely prevent either marriage or divorce. The Court noted that there were "[m]any [persons], able in theory to satisfy the statute's requirements, [who] will be sufficiently burdened by having to do so that they will in effect be coerced into forgoing their right to marry." 434 U.S. at 387, 98 S.Ct. at 681. The inquiry made by the Court was whether the statutory classification "directly and substantially" interfered with the right to marry. *Id.* This is consistent with the approach taken by the Court in considering the burden of justification to be met by statutory classifications affecting other fundamental rights.

In *Dunn v. Blumstein,* 405 U.S. 330, 337, 92 S.Ct. 995, 1000, 31 L.Ed.2d 274 (1972), the Court invoked strict scrutiny in invalidating a durational residency requirement for voting which directly impinged on two fundamental rights, the right to vote and the right to interstate travel. In explaining its use of that standard even though the Tennessee statute did not completely deny the right to travel, the Court stated:

> Of course, it is true that the two individual interests affected by Tennessee's durational residence requirements are affected in different ways. Travel is permit-

ted, but only at a price; voting is prohibited. The right to travel is merely penalized, while the right to vote is absolutely denied. But these differences are irrelevant for present purposes. *Shapiro [v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969)] implicitly realized what this Court has made explicit elsewhere:

> > "It has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution . . . ."

*Id.* at 341, 92 S.Ct. at 1002 (citation omitted). *See* L. Tribe, *American Constitutional Law* 1005 n.18 (1978). This approach is equally applicable to burdens on the right of marriage and divorce, for, as the Court stated in *Zablocki,* "[E]ven those who can be persuaded to meet the statute's requirements suffer a serious intrusion into their freedom of choice in an area in which we have held such freedom to be fundamental." 434 U.S. at 387, 98 S.Ct. at 681 (footnote omitted).

Of course, not every classification which may affect the marital relationship in any way warrants strict scrutiny. For example, in *Califano v. Jobst,* 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977), the Court had applied the rational basis test in rejecting an equal protection challenge to a provision of the Social Security Act terminating, under certain circumstances, a dependent child's Social Security benefits when the child married. The Court subsequently characterized *Califano v. Jobst* as a case involving "legislation providing governmental payments of monetary benefits that has an incidental effect on a protected liberty." *Califano v. Aznavorian,* 439 U.S. 170, 177, 99 S.Ct. 471, 475, 58 L.Ed.2d 435 (1978). In the *Zablocki* opinion which was decided the same term and only shortly after *Califano v. Jobst,* the Court stated "[b]y reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny." 434 U.S. at 386, 98 S.Ct. at 681. The *Zablocki* majority distinguished *Zablocki* from

the earlier *Califano v. Jobst* case on the basis of the "directness and substantiality of the interference with the freedom to marry." 434 U.S. at 387 n.12, 98 S.Ct. at 681 n.12.

The majority in this case adroitly sidesteps deciding whether the New Jersey statute trenched upon a fundamental interest by concluding the statute "did not 'significantly' or 'directly or substantially' infringe upon the right of individuals to obtain dissolutions of their marriages." Majority op. at 903. The majority reaches its conclusion in the face of the contrary findings of the district court. That court found that although Murillo did not qualify as an indigent, at the time that she initiated these proceedings she was working as a domestic and earning $25.00 to $28.00 per day. The district court concluded that "[t]he State of New Jersey had thus placed plaintiff in a dilemma: either she would have had to pay what was to her a substantial sum to sue for divorce; or she would have remained hostage to a marriage which under the substantive law of the State she was entitled to have dissolved." 508 F.Supp. at 832. Even if the majority can formulate some basis to reject these findings, which indicate more than a mere incidental effect on the exercise of the right to obtain a divorce, it provides no record basis to support its own contrary conclusion. *See Pullman-Standard v. Swint*, —— U.S. ——, —— – ——, 102 S.Ct. 1781, 1788–1790, 72 L.Ed.2d 66 (1982). Essentially all the majority relies upon is the principle, patently unassailable, that the state has the right to collect a portion of its expenses from those persons who seek a divorce. It appears to me the majority has intermingled two analytically distinct issues: whether there is a sufficient impact or burden imposed by the classification to warrant use of the strict scrutiny standard in the first place, and whether the classification survives the application of that level of scrutiny. In analyzing whether there is a sufficiently substantial burden to warrant use of the strict scrutiny standard, I would look both to the district court's findings and the undisputed fact that the matrimonial fee penalized each New Jersey resident (with the exception of indigents) who sought to exercise his or her right to obtain a divorce. These evince a sufficiently direct and sweeping burden on a fundamental right to subject the classification to heightened judicial scrutiny. The majority's statement that the "hardship" on individuals such as Murillo "although unfortunate, falls short of establishing that such persons have been *precluded* from obtaining divorces", Majority op. at 904 (emphasis added), overlooks the Supreme Court precedent discussed *supra* at pp. 914–915 where the Court stated that total preclusion is not a prerequisite to invocation of strict scrutiny.

Turning then to the question whether the classification can withstand such heightened scrutiny, it is necessary to consider whether the statutory classification "is supported by sufficiently important state interests and is closely tailored to effectuate only those interests. *See, e.g., Carey v. Population Services International*, 431 U.S. 678, at 686, 97 S.Ct. 2010, at 2016, 52 L.Ed.2d 675; *Memorial Hospital v. Maricopa County*, 415 U.S. 250, at 262–263, 94 S.Ct. 1076, at 1084, 39 L.Ed.2d 306; *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S., at 16–17, 93 S.Ct., at 1287–1288; *Bullock v. Carter*, 405 U.S. 134, 144, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972)." *Zablocki v. Redhail*, 434 U.S. at 388, 98 S.Ct. at 682. Burdens which operate directly upon fundamental rights, including the right to marry or to obtain a divorce, are not necessarily constitutionally infirm. "[A] state may legitimately say that no one can marry his or her sibling, that no one can marry who is not at least 14 years old, that no one can marry without first passing an examination for venereal disease, or that no one can marry who has a living husband or wife." *Zablocki v. Redhail*, 434 U.S. at 392, 98 S.Ct. at 684 (Stewart, J., concurring). The legitimate and justifiable objectives served by such statutory requirements are evident.

In *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), the Court upheld an Iowa one-year durational residency re-

quirement for persons seeking a divorce. Without indicating which standard of review it was employing, the Court focused on "the state interest in requiring that those who seek a divorce from its courts be genuinely attached to the State, as well as a desire to insulate divorce decrees from the likelihood of collateral attack." *Id.* at 409, 95 S.Ct. at 562. The Court found that because the Constitution permits other states to disregard a finding of domicile entered in an *ex parte* proceeding in the face of "cogent evidence" to the contrary, it was "quite permissible" for Iowa to infer that the one-year residency requirement "provides a greater safeguard against successful collateral attack than would a requirement of bona fide residence alone." *Id.* at 408, 95 S.Ct. at 561 (footnote omitted).[1] It is noteworthy that in *Sosna* the Court stated that once the one-year period expired, Sosna "could ultimately have obtained the same opportunity for adjudication which she asserts ought to have been hers at an earlier point in time." *Id.* at 406, 95 S.Ct. at 560. In contrast, the New Jersey special matrimonial fee imposed a permanent burden which would not automatically be removed by the passage of time.

In this case the State has not always posited the legislative objective behind the special matrimonial fee with either clarity or consistency. New Jersey originally sought to justify the fee on the basis of the following factors listed in its Answers to Interrogatories:

A. Judge's time spent on matrimonial cases, including the fact that all matrimonial cases require bench time.

B. Additional time spent by the Clerk of the Superior Court's office including verification of an Answer, verification to see if default properly entered, and verification of the service upon the defendant.

C. Additional post-judgment time spent on matrimonial vs. other cases.

D. Trial fee encourages reflective thought.

According to the State itself, at trial "the first three contentions were withdrawn" but "the fourth was maintained in a somewhat modified form, with the State arguing that the additional fees would serve the State public policy of not encouraging divorces." Brief on Behalf of Defendant-Appellant at 7–8. On appeal the State shifted its position and, at least as now reformulated by the majority, the rationale posited for the special matrimonial fee is that "it would not have been unreasonable for the Legislature to have been of the opinion that the State's divorce system made financial as well as non-financial demands upon the judiciary, thereby justifying additional monetary support from the users of that system". Majority op. at 906.[2] This appears to be in substance the rationale which the State expressly abandoned in the trial court.[3] It is also at variance with the pur-

---

1. The majority suggests that *Sosna* may be read as support for the proposition that divorce does not implicate any fundamental right. Majority op. at 903 n.9. *Sosna*, however, never addressed the issue. Any inference to be drawn from *Sosna* respecting the right to divorce would seem to apply equally to the right to interstate travel, also at issue in that case, which the Supreme Court has repeatedly held to be fundamental.

2. The State's suggestion that because this is an equal protection case, the trial court must consider any conceivable rationale, whether or not it was raised, and that we in turn have an obligation to consider the State's contentions, whether or not raised below, is at variance with our oft-stated view that we will ordinarily not consider issues on appeal that were not presented to the trial court. *See, e.g., Newark*

*Morning Ledger Co. v. United States*, 539 F.2d 929, 932–33 (3d Cir. 1976).

3. The majority does not reach the State's contention that the matrimonial fee "encourages reflective thought" and thereby serves the State's interest in "not encouraging divorce". The trial court found that since the enactment of no-fault divorce in 1971, the purpose to discourage divorces has not existed. Subsequent statutory enactments may show abandonment of a prior legislative purpose. *Eisenstadt v. Baird*, 405 U.S. 438, 448, 92 S.Ct. 1029, 1035, 31 L.Ed.2d 349 (1972). In any event, the State offered no basis for finding any connection between the special matrimonial fee and encouraging reflective thought before divorce. The numerous waiting periods already contained in New Jersey's substantive law of divorce, N.J.Stat.Ann. § 2A:34–2, provide an ef-

pose ascribed to the special matrimonial fee by the New Jersey Legislature when it repealed that fee.[4]

The district court summarized the State's contention as "that the matrimonial fees provided a means of supporting the additional court costs required to give divorce cases the high degree of scrutiny required under New Jersey law." 508 F.Supp. at 835–36. In considering this argument, notwithstanding its withdrawal by the State, the district court found:

> Although a minority of actions, filed on the basis of fault, may still require special judicial scrutiny, most matrimonial litigants require no extraordinary judicial supervision. Indeed, it was demonstrated at trial that *the average cost of disposing of a matrimonial case was significantly less than the average cost of adjudicating other civil actions.*

508 F.Supp. at 836 (emphasis in original; footnote omitted). The State does not dispute this factual finding.

As I understand the State's contention on appeal, it is that it is irrelevant whether in fact matrimonial cases "require additional monies to operate in conformity with state law" because under the rational basis standard it is sufficient if the legislature may have reasonably, albeit erroneously, thought they did or predicted they would. The majority appears to have accepted this position. I need not comment on whether the majority has appropriately applied the

rational basis standard, because I believe it is evident that the statutory classification cannot stand under the heightened scrutiny which I would apply. If the statute is not "closely tailored to effectuate only [the important state] interests," then it cannot be sustained. The matrimonial fees cannot be necessary or "closely tailored" to defray the higher costs of divorce actions when, as a factual matter, those higher costs do not exist. Moreover, there is some question whether burdens on fundamental rights can be defended on financial grounds alone. *See Shapiro v. Thompson,* 394 U.S. at 633, 89 S.Ct. at 1330. *See also Sosna v. Iowa,* 419 U.S. at 406, 95 S.Ct. at 560 ("Iowa's residency requirement may reasonably be justified on grounds *other than* purely budgetary considerations or administrative convenience") (emphasis added).

The majority, in attempting to support its position that the special divorce fee does not "significantly" or "directly or substantially" infringe upon the right to divorce, has made arguments which appear to be directed to whether that fee, even if it imposes a burden, can be justified. Thus, for example, the majority mischaracterizes the challenge to the fee as, in effect, a claim that the State must provide a "free divorce." Murillo does not claim that she is entitled to a *free* divorce, but only that her exercise of her right to a divorce should not be penalized by imposing upon her a fee

---

fective and more closely tailored means for the state to insure that its citizens do not hastily and unreflectingly seek a divorce.

4. According to the legislative statement which accompanied the repealer of the fee,

> These proposed amendments to the New Jersey court fee system would serve two purposes. First, they would eliminate the approval fee required in matrimonial cases before the Superior Court—currently, these fees are $50.00 in uncontested cases and $60.00 in contested cases. Secondly, this legislation would increase the general fee for the filing of all civil complaints from $60.00 to $75.00.
>
> In the past, the *$50.00 or $60.00 differential required for matrimonial cases was justified by an additional review provided in such cases by a standing master who determined whether or not the matter was fit for trial.*

Today, no similar review exists to justify any such differential in fees. As a result, these approval fees for matrimonial cases have been questioned as an unreasonable classification in an action pending before the Federal district court. The elimination of these fees would thus serve to eliminate an anachronism from the court's fee structure.

The simultaneous increase in the general filing fee for all civil complaints, from $60.00 to $75.00, is a necessary increase in court revenues to adjust for the elimination of the matrimonial fees and to compensate for inflationary pressures.

1980 N.J.Sess.Law Serv., ch. 80, at 271 (emphasis added). I see no reason why the majority's hypothetical rationale for the special matrimonial fee should be preferred over that given by the legislature itself.

higher than that for other litigants. She is not making a due process challenge but an equal protection challenge, concepts which the majority has confused. Therefore, the majority's suggestion that Murillo's challenge could also be leveled at "the seventy-five dollar *filing* fee currently required of all litigants", Majority op. at 905, misconceives the nature of the constitutional challenge. The equal protection attack on the matrimonial fee is premised on the fact that litigants seeking a divorce were singled out for discriminatory treatment because they were the *only* litigants required to pay a *special fee.* It is completely beside the point that the State uses the filing fee to seek to defray some of the costs of terminating the marital relationship. Presumably that is the basis on which the State charges a filing fee to any litigant. The State produced no evidence that there was any basis to charge a matrimonial litigant a *higher* fee; it ultimately abandoned the argument that there was any empirical basis for such a higher fee, and in fact it is currently charging all litigants the same general filing fee, which it increased from $60 to $75 in 1981 "to adjust for the elimination of the matrimonial fees and to compensate for inflationary pressures." See note 4 *supra.*

Because a fee for filing divorce actions directly affected the exercise of a fundamental interest, the statute must withstand heightened scrutiny, not the inadequate level of scrutiny used by the majority. Using what I believe is the correct level of scrutiny, the classification must fall.[5]

---

5. I cannot avoid noting that the district court has indicated that it would have originally granted an injunction to enjoin collection of the fee had it decided the case when it was first presented because it believed the matrimonial fee was unconstitutional. Transcript of Sept. 10, 1980, at 111. Had it done so, the fund at issue in this case would not have accumulated. It came into being only because the district court stayed proceedings in order to give the New Jersey Legislature an opportunity to resolve the matter of the matrimonial fee. The district court noted its unhappiness with the action of the New Jersey Legislature which made its abolition of the matrimonial fee prospective only and made no provision for the return of the already collected fees held in escrow pursuant to the district court order. *Id.* at 111–12. Since this fund was created only because of the delay of action by the New Jersey Legislature, it is ironic that it should be permitted by this decision to profit by that very delay.