**Mary Lou GANGE, on behalf of herself and others similarly situated, unknown as a class, Plaintiff and Appellant,**

v.

**CLERK OF BURLEIGH COUNTY DISTRICT COURT and Department of Public Instruction, Defendants and Appellees.**

Civ. No. 870389.

Supreme Court of North Dakota.

Sept. 20, 1988.

---

Baer & Asbridge, Chartered, Bismarck, for plaintiff and appellant; argued by Richard B. Baer.

Laurie J. Loveland (argued), Asst. Atty. Gen., Bismarck, for defendant and appellee Dept. of Public Instruction.

Anna M. Frissell, Asst. State's Atty., Bismarck, for defendant and appellee Clerk of Burleigh County Dist. Court. Appearance by Anna M. Frissell.

MESCHKE, Justice.

Mary Lou Gange appealed from a district court judgment upholding, as constitutional, a statute which requires collection of a $50 fee from every person filing a divorce action to fund a displaced homemaker program. We affirm.

Section 14–06.1–15, N.D.C.C., assesses a $50 fee against every person filing "a petition for dissolution of marriage, annulment, or separation from bed and board." This fee, called a "marriage dissolution fee" by the parties, is in addition to the regular $20 filing fee for civil actions [see § 11–17–04(1), N.D.C.C.], but may be waived if the person is indigent. See § 27–01–07, N.D.C.C. The $50 fee is not assessed against any other civil litigant.

Gange sued the Clerk of the Burleigh County District Court alleging that the marriage dissolution fee is an unconstitutionally discriminatory tax. She requested that the court: 1) order the clerk to file her divorce action upon the payment of the regular $20 filing fee; 2) prohibit the clerk from spending fees previously collected and order an accounting of them; 3) order a refund of the fees previously paid; and 4) permit the lawsuit to proceed as a class action. The trial court immediately directed the clerk to accept a $20 filing fee from Gange for her divorce action. Later, the Department of Public Instruction was added as a defendant.

The trial court rejected Gange's constitutional challenges to the marriage dissolution fee, denied Gange's requested relief and ordered that she pay the full $70 filing fee for her divorce action. Gange appealed.[1]

## DISPLACED HOMEMAKER PROGRAM

The clerk of court is required by § 14–06.1–15 to send the $50 marriage dissolution fee to the State Treasurer to fund the "displaced homemaker program" created by Chapter 14–06.1, N.D.C.C. The State Legislature, when it enacted Chapter 14–06.1 in 1981, declared that many persons in this state become "displaced" without any source of income through separation, divorce, death, or disability of their spouse. *See* § 14–06.1–01, N.D.C.C.[2] The Legislature thus created a program to help these persons with job counseling [§ 14–06.1–05, N.D.C.C.], job training [§ 14–06.1–06, N.D.C.C.], health counseling and money management training [§ 14–06.1–09(1) and (2), N.D.C.C.], assistance in finding permanent employment [§ 14–06.1–08, N.D.C.C.], and other services. The state contracts with and makes grants to nonprofit organizations for the services to displaced homemakers.

The Superintendent of Public Instruction was authorized under § 14–06.1–10, N.D.C.C., to establish eligibility requirements, but "[a]ny interpretation of eligibility for services should have as first priority the service of displaced homemakers." A "displaced homemaker" was defined in § 14–06.1–02(2), N.D.C.C., as an individual who:

"a. Has worked in the individual's home providing unpaid services for household members;

"b. Has been or is unemployed or underemployed;

"c. Has had or will have difficulty finding employment; and

"d. (1) Is widowed, divorced, separated, or abandoned; or

"(2) Because of the disability of the individual's spouse, is displaced from the individual's former economically dependent role."

Section 14–06.1–14, N.D.C.C., created a "displaced homemaker account" for deposit of the marriage dissolution fees collected by the clerks of court. Section 14–06.1–16(1), N.D.C.C., made a continuing appropriation of $250,000 "or so much thereof as may be necessary" per biennium from the

---

**1.** We reject Gange's contention that the district court's findings of fact are inadequate under Rule 52(a), N.D.R.Civ.P. The purpose of Rule 52(a) is to enable the appellate court to understand the factual issues determined by the trial court as a basis for its conclusions of law and judgment. *Koller v. Koller,* 377 N.W.2d 130, 131 (N.D.1985). Thus, findings that enable us to understand the court's reasoning are all that is necessary. *Healy v. Healy,* 397 N.W.2d 71, 75 (N.D.1986). This trial court's memorandum decision satisfied the Rule.

**2.** Section 14–06.1–01, N.D.C.C., declares the legislative purpose for enacting the displaced homemaker program:

"*Legislative finding and declaration.* The legislative assembly finds that there is an ever-increasing number of persons in this state, who, having fulfilled a role as homemaker, find themselves 'displaced' in their middle years through separation, divorce, death or disability of spouse, or other loss of support. As a consequence, displaced homemakers are very often without any source of income; they are usually ineligible for categorical welfare assistance; they are subject to one of the highest unemployment rates of any sector of the work force; they often face con-

tinuing discrimination in employment because they are older and have no recent paid work experience; they are often ineligible for unemployment insurance because they have been engaged in unpaid labor in the home; they are often ineligible for social security because they are too young, and many will never qualify for social security because they have been divorced from the family wage earner; they have often lost their rights as beneficiaries under employers' pension and health plans through divorce or death of spouse, despite many years of contribution to the family well-being; and they are most often ineligible for medical assistance and are generally unacceptable to private health insurance plans because of their age.

"It is the intention of the legislative assembly in enacting this chapter to provide the necessary counseling and guidance, job readiness training, and services for displaced homemakers so that they may enjoy the independence and economic security vital to a productive life and to improve the health and welfare of this ever-growing group of citizens."

account for the program. The statute further made a continuing appropriation of "any additional funds that may become available through grants, gifts, or other sources," but these funds may be spent only upon approval of the Emergency Commission. § 14–06.1–16(2), N.D.C.C. At least 95 percent of the funds appropriated are required to be used for the "direct provision" of displaced homemaker services. § 14–06.1–16(1) and (2), N.D.C.C.

The administrator of the displaced homemaker program in the Department of Public Instruction since 1983 testified that:

> "6. For the fiscal year ending June, 1986, 474 individuals were enrolled in the displaced homemaker program. Of those 474 individuals, 267 persons (or 56.33%) were divorced, 78 (or 16.46%) were separated, 27 (or 5.70%) were widowed, 84 (or 17.72%) were abandoned, and 18 (or 3.80%) were married with a disabled spouse.

> "7. For the fiscal year ending June, 1987, 387 individuals were enrolled in the displaced homemaker program. Of those 387 individuals, 232 (or 59.95%) were divorced, 117 (or 30.23%) were separated, 25 (or 6.46%) were widowed, 2 (or .52%) were abandoned, and 11 (or 2.84%) were married with a disabled spouse."

For the fiscal years prior to 1986, the statistical data on individuals enrolled in the program was similar. Since 1983 all of the funds for the program have come from the marriage dissolution fee imposed by § 14–06.1–15, N.D.C.C.

## CONSTITUTIONALITY

Both sides agreed that the marriage dissolution fee is a "tax" for purposes of constitutional analysis. *See Menz v. Coyle,* 117 N.W.2d 290, 297 (N.D.1962). Gange asserted that the marriage dissolution fee violates: 1) the due process and equal protection clauses of the federal constitution and the equal protection provisions of the state constitution; 2) Article X, § 3 of the state constitution which requires that a tax statute state distinctly its object and that the tax be applied to that object alone; 3) Article X, § 12 of the state constitution which requires all moneys belonging to the state to be paid to the State Treasurer and disbursed only pursuant to legislative appropriation; and 4) former Article IV, § 43 of the state constitution which prohibited the enactment of local or special laws.[3]

### I

■ Gange contended that the marriage dissolution fee violates the 14th Amendment to the federal constitution and Article I, §§ 21 and 22[4] of the state constitution. Gange's arguments under each of these provisions were intertwined and were based primarily upon her underlying assertion that Chapter 14–06.1, N.D.C.C., "creates a separate class of citizens in a vague way and confers upon 'displaced homemakers' special privileges not available to everyone...." Because the methods of analysis for resolving challenges to legislative classifications under these constitutional provisions are essentially the same [*see*

---

3. Relying on *Malin v. La Moure County,* 27 N.D. 140, 145 N.W. 582 (1914), Gange also asserted that the marriage dissolution fee violates the provisions of Article I, § 9 of the state constitution, which provides:

> "All courts shall be open, and every man for any injury done him in his lands, goods, person or reputation shall have remedy by due process of law, and right and justice administered without sale, denial or delay. Suits may be brought against the state in such manner, in such courts, and in such cases, as the legislative assembly may, by law, direct."

However, this challenge was not presented to the trial court.

It is well established that an issue not presented to the trial court cannot be considered for the first time on appeal. *E.g., Farmers State Bank of Leeds v. Thompson,* 372 N.W.2d 862, 865 n. 3 (N.D.1985). This constraint applies with particular force to a constitutional issue. *See Wisdom v. State, N.D. Real Estate Comm'n,* 403 N.W.2d 19, 22 (N.D.1987). Therefore, we decline to address this issue.

4. "*Section 21.* No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly; nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens."

"*Section 22.* All laws of a general nature shall have a uniform operation."

*Nygaard v. Robinson,* 341 N.W.2d 349, 357 n. 1 (N.D.1983); *So. Valley Grain Dealers v. Bd. of County Comm'rs,* 257 N.W.2d 425, 435 (N.D.1977)], we, like the trial court, address these challenges together under an equal protection analysis.

When a statute is challenged on equal protection grounds, we first locate the appropriate standard of review. We apply strict scrutiny to an inherently suspect classification or infringement of a fundamental right and strike down the challenged statutory classification "unless it is shown that the statute promotes a compelling governmental interest and that the distinctions drawn by the law are necessary to further its purpose." *State ex rel. Olson v. Maxwell,* 259 N.W.2d 621, 627 (N.D.1977). When an "important substantive right" is involved, we apply an intermediate standard of review which requires a " 'close correspondence between statutory classification and legislative goals.' " *Hanson v. Williams County,* 389 N.W.2d 319, 323, 325 (N.D.1986) [quoting *Arneson v. Olson,* 270 N.W.2d 125, 133 (N.D.1978)]. When no suspect class, fundamental right, or important substantive right is involved, we apply a rational basis standard and sustain the legislative classification unless it is patently arbitrary and bears no rational relationship to a legitimate governmental purpose. *See State v. Knoefler,* 279 N.W. 2d 658, 662 (N.D.1979). We apply a rational basis standard in this case for two reasons.

First, no inherently suspect classification is involved here, nor are we convinced that, for all purposes, the right to divorce constitutes a fundamental right. While the right to marry has been characterized as being of "fundamental importance," [*Zablocki v. Redhail,* 434 U.S. 374, 384, 98 S.Ct. 673, 680, 54 L.Ed.2d 618 (1978)], "[n]o decision of the Supreme Court stands squarely for the proposition that state restrictions on divorce must be evaluated under the same exacting standards as restrictions on ... the right to marry." *Murillo v. Bambrick,* 681 F.2d 898, 902–903 (3d Cir.), *cert. denied,* 459 U.S. 1017, 103 S.Ct. 378, 74 L.Ed. 2d 511 (1982). *See also Sosna v. Iowa,* 419 U.S. 393, 406, 95 S.Ct. 553, 561, 42 L.Ed.2d 532 (1975) [Court applied rational basis test in upholding a state's one year durational residency requirement for divorce]; *Developments in the Law: The Constitution and the Family,* 93 Harv.L.Rev. 1156, 1309 (1980) ["The Supreme Court has not recognized a substantive constitutional right to divorce."]

Second, and more important, even if we were to elevate the right to divorce to a fundamental status or recognize it as an important substantive right for this purpose, the challenged law must be shown to "significantly interfere" with the right to obtain a divorce before a court need apply heightened scrutiny. *Zablocki v. Redhail, supra,* 434 U.S. at 386, 98 S.Ct. at 681; *Califano v. Jobst,* 434 U.S. 47, 54, 98 S.Ct. 95, 99–100, 54 L.Ed.2d 228 (1977); *Murillo v. Bambrick, supra,* 681 F.2d at 903; *Cahoon v. Heckler,* 574 F.Supp. 1021, 1023 (D.Mass.1983), *aff'd,* 740 F.2d 953 (1st Cir. 1984). We do not believe the marriage dissolution fee significantly interferes with a person's right to obtain a divorce. The fee obviously does not prohibit a person from a divorce because it may be waived if the applicant is indigent. *See* § 27–01–07, N.D.C.C. Of course, the $50 fee will cause some non-indigent persons to forego other uses of that amount of their resources, and thus impose a relatively moderate financial effect on the decision to divorce. However, as the Third Circuit Court of Appeals stated in upholding a New Jersey $50 matrimonial litigation fee in *Murillo v. Bambrick, supra,* 681 F.2d at 904, "this hardship, although unfortunate, falls short of establishing that such persons have been precluded from obtaining divorces."

Moreover, that the fee is not charged to other civil litigants does not constitute a significant burden on the right to obtain a divorce:

"A divorce action and, for example, a tort or contract action, obviously are not interchangeable alternatives. The higher cost for a divorce, as opposed to other civil actions, would hardly encourage those seeking a divorce to abandon their efforts in favor of other, less expensive forms of litigation. The level of the fee

charged for, say, a tort action, therefore, is irrelevant to the presence of any burden on the right to obtain a divorce." *Murillo v. Bambrick, supra,* 681 F.2d at 905 (footnote omitted).

We therefore conclude that a rational basis standard applies in this case. *See also Browning v. Corbett,* 153 Ariz. 74, 734 P.2d 1030, 1032 (Ct.App.1986). Also, we believe that this legislation satisfies a rational basis review.

Gange has not suggested that Chapter 14–06.1, N.D.C.C., implements a policy that the Legislature has no power to pursue. The legislation, and the policy set forth in § 14–06.1–01, N.D.C.C., recognizes a distinct class who are in need of special assistance "so that they may enjoy the independence and economic security vital to a productive life." Thus, the legislation certainly serves a legitimate governmental interest.

Furthermore, the means chosen to implement this policy bears a rational relationship to the accomplishment of the legislative objective. It was reasonable for the Legislature to believe that most of the persons who would qualify as a displaced homemaker in need of program assistance would become so through a breakup of the family unit. Indeed, as the statistics in the record show, divorces, separations, and annulments account for most of the program's participants. It is therefore rational to raise funds for the program by requiring payment of a reasonable fee in divorce, separation, and annulment actions. *Cf. Browning v. Corbett, supra,* 734 P.2d at 1032.

It is true that some persons benefit from the program who do not pay the marriage dissolution fee, and that others who do pay the fee will not participate in the program. But the Legislature has broad discretion in enacting laws which affect some citizens differently than others. *Nygaard v. Robinson, supra,* 341 N.W.2d at 359. " 'The equal protection clause does not require the state to maintain a rigid rule of equal taxation, to resort to close distinctions, or to maintain a precise scientific uniformity; and possible differences in tax burdens not

shown to be substantial or which are based on discriminations not shown to be arbitrary or capricious, do not fall within constitutional prohibitions.' " *State v. Nichols,* 66 N.D. 355, 265 N.W. 859, 874 (1935) [quoting *Lawrence v. State Tax Commission,* 286 U.S. 276, 284, 52 S.Ct. 556, 557, 76 L.Ed. 1102 (1932) ]. Here, any over or under-inclusiveness is well within constitutionally acceptable limits.

Gange asserted, however, that the marriage dissolution fee nevertheless violates the uniformity provisions of the state constitution under this court's decision in *Menz v. Coyle, supra,* because the fee is collected only in divorce, separation, and annulment actions. In *Menz v. Coyle* this court upheld as uniform a statute that required payment of an additional $2.50 fee for filing actions in district court and for filing petitions for letters testamentary, letters of administration, and letters of guardianship in county courts. The funds were paid to the State Bar Association for supervision and improvement of the judicial system. The court rejected the argument that the tax was not uniform as required by the state constitution because the law did not apply to all who use the courts, stating:

"The mere fact that the tax is not imposed upon others who may be forced into court as defendants or as third parties does not make the statute unconstitutional and lacking in uniformity in its application. *If the statute provided that the tax should be imposed only upon persons filing certain types of actions, as, for example, a tort action, then the law would not be uniform in its application.* But where, without any discrimination or favor, the tax is imposed upon all who commence actions in district court and upon all who file petitions for letters testamentary, letters of administration, or letters of guardianship in county court, it clearly is not subject to the objection that the tax is not uniform." [Emphasis added.] *Menz v. Coyle, supra,* 117 N.W.2d at 298.

The court's statement, that the statute would not be uniform if it imposed a fee only upon persons filing certain types of

actions, is dictum and cannot be reconciled with the court's actual holding in *Menz v. Coyle*. The court upheld the tax against the uniformity challenge even though it only applied to county court *probate* actions as opposed to other county court actions.[5] The holding of *Menz v. Coyle*, of course, controls over that errant contradictory statement, which we disavow today.

We conclude that the marriage dissolution fee does not violate the due process and equal protection clauses of the federal constitution or Article I, §§ 21 and 22 of the state constitution.[6]

## II

■ Gange asserted that Chapter 14–06.-1, N.D.C.C., violates Article X, § 3 of the state constitution, which states in pertinent part that "every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied." We disagree.

Chapter 14–06.1 sets out specific programs and services to be funded by the marriage dissolution fee, defines displaced homemakers who are eligible for services, and specifically states how the object of the tax will be accomplished. Thus, even if we assume that this constitutional provision requires a narrowly defined statutory objective, we believe Chapter 14–06.1 "distinctly" states the object of the tax. *See Menz v. Coyle, supra*, 117 N.W.2d at 298.

Further, the funds from the fee go for statutory purposes only. Although § 14–06.1–16 states that "[a]t least ninety-five percent of the funds appropriated by this subsection must be used by the superintendent for the direct provision of displaced homemaker services," this does not

affect our conclusion. It is clear that by directing 95 percent of the funds to be used for "direct provision" of services, the Legislature only intended to cap costs connected with administering the program at five percent. This is borne out by the legislative history of the statute. *See* Hearings on S.B. 2307, Senate Social Services and Veterans Affairs Committee, Feb. 1, 1985, at p. 3 (statement of David Massey); Hearings on S.B. 2307, Senate Appropriations Committee, February 12, 1985, at p. 1 (statement of Sen. Mushik).

Chapter 14–06.1 does not violate Article X, § 3 of the state constitution.

## III

■ Gange claimed that Chapter 14–06.1 also violates Article X, § 12 of the state constitution apparently because the fees are not required to be paid to the State Treasurer at the outset and because the Legislature cannot constitutionally "bind future Legislatures" through a continuing appropriation. These assertions are without merit.

Article X, § 12 requires that "[a]ll public moneys, from whatever source derived, shall be paid over monthly by the public official ... receiving the same, to the state treasurer, and deposited by him to the credit of the state, and shall be paid out and disbursed only pursuant to appropriation first made by the legislature." Section 14–06.1–15, N.D.C.C., specifically directs the clerks of court to pay the marriage dissolution fee to the State Treasurer for deposit in the state's displaced homemaker account.

Nor does Chapter 14–06.1 "bind future Legislatures" through a continuing appro-

---

5. At the time *Menz v. Coyle, supra*, was decided, the jurisdiction of county courts was not limited to probate matters. Former § 27–07–02, N.D. C.C., provided that "[i]n a county not having a county court of increased jurisdiction, the jurisdiction and powers formerly vested in the justices of the peace are hereby conferred concurrently upon the county court, unless and until a county justice is appointed." Justices of the peace had "jurisdiction in all civil actions when the amount in controversy exclusive of costs does not exceed two hundred dollars...." § 33–0104, N.D.Rev.Code of 1943.

6. Gange also asserted that the marriage dissolution fee is unconstitutional because, unlike the fee upheld in *Menz v. Coyle, supra*, it does not serve to raise funds for a program that is court-related. Whatever relevance this argument may have to a constitutional challenge based upon Article I, § 9 of the state constitution, we do not believe it is relevant to the question whether the fee violates the due process and equal protection clauses of the federal constitution or Article I, §§ 21 and 22 of the state constitution.

priation. Continuing appropriations are nothing new to the legislative process [*see State v. Sorlie*, 56 N.D. 650, 219 N.W. 105 (1928)], and we agree with those courts which have held under similar state constitutional provisions that continuing appropriations are a valid "appropriation first made by the legislature." *See, e.g., In re Continuing Appropriations*, 18 Colo. 192, 32 P. 272 (1893), *State v. Burdick*, 4 Wyo. 272, 33 P. 125 (1893). Moreover, a continuing appropriation is "continuing" only if future legislative assemblies choose not to repeal or modify it. *See State ex rel. Lesmeister v. Olson*, 354 N.W.2d 690, 700 (N.D.1984). This appropriation does not violate Article X, § 12 or unconstitutionally bind future legislatures.

### IV

■ Gange asserted that Chapter 14–06.1, N.D.C.C., when it was enacted, violated ·former Article IV, § 43(1) and (23) of the state constitution, which was repealed by voters in 1984, but effective December 1, 1986. *See* 1985 N.D.Sess.Laws Ch. 707, §§ 6, 7. That constitutional provision prohibited the legislative assembly from passing "local or special laws" for, among other things, "granting divorces" and "the assessment or collection of taxes." Although this constitutional provision is no longer in effect, we must consider the claim because "the validity of a statute is ordinarily determined by the constitutional provisions in effect at the time of the enactment of the statutes rather than by the current constitutional provisions." *Paluck v. Bd. of County Comm'rs, Stark County*, 307 N.W.2d 852, 858 (N.D.1981).

In *State v. Jensen*, 333 N.W.2d 686, 695 (N.D.1983), we stated that " 'a "special law" is one which relates only to particular persons or things of a class, as distinguished from a "general law," which applies to all things or persons of a class ... and a "local law" is one which applies to a specific locality or spot, as distinguished from a law which operates generally throughout the entire state....' " [quoting *State v. First State Bank*, 52 N.D. 231, 202 N.W. 391, 399 (1924)]. *See also Vermont Loan & Trust Co. v. Whithed*, 2

N.D. 82, 49 N.W. 318 Syllabus 2 (1891). The marriage dissolution fee is not assessed only in one specific locality of the state or only against particular persons of a class, but applies uniformly to the entire class of persons who file divorce or separation actions throughout North Dakota. Consequently, Chapter 14–06.1 did not constitute a local or special law.

Our disposition of this appeal renders it unnecessary to address the other issues raised by the parties. Accordingly, the judgment is affirmed.

ERICKSTAD, C.J., and LEVINE, VANDE WALLE and GIERKE, JJ., concur.